TH:ALK/GN
F. #2017R02045

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

PPASSIM ELDER,
      also known as "Bsam Elder,"
      "Big Sam" and "Sam," and
WILBERT BRYANT,
      also known as "Will" and "La,"

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No. 18-CR-92 (S-5) (WFK)

## THE GOVERNMENT'S SENTENCING MEMORANDUM
## AS TO DEFENDANTS PPASSIM ELDER AND WILBERT BRYANT

BREON PEACE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Genny Ngai
Anna L. Karamigios
Assistant U.S. Attorneys
    (Of Counsel)

1

TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 2

I.   The Extortion of Mahmoud and Hani Kasem and Murder of Hani Kasem ...................... 2

II.  The Bank Fraud Schemes ............................................................................................. 5

    A.  Justin Rick ............................................................................................................ 6

    B.  Thomas Hardy ...................................................................................................... 6

    C.  Cordell Newby ..................................................................................................... 7

    D.  Amy Kronenthal ................................................................................................... 7

    E.  Other Victims ....................................................................................................... 7

III. The Extortion of the Rabah Family ............................................................................... 8

IV.  The Defendants' Other Crimes ..................................................................................... 9

    A.  Extortion and Violent Offenses ............................................................................ 9

    B.  Access Device Fraud ........................................................................................... 10

    C.  Narcotics and Cigarette Trafficking .................................................................... 10

V.   The Defendants' Efforts to Obstruct Justice and Subsequent Crimes ........................... 10

    A.  Elder .................................................................................................................... 10

    B.  Bryant .................................................................................................................. 13

VI.  The Trial and Subsequent Proceedings ........................................................................ 14

VII.   Applicable Law ......................................................................................................... 15

VIII.  The Guidelines .......................................................................................................... 17

    A.  Elder .................................................................................................................... 17

    B.  Bryant .................................................................................................................. 20

    C.  The Defendants' Guidelines Objections .............................................................. 21

        1.  Joint Objections ............................................................................................ 22

2.  Bryant ................................................................................................ 25

3.  Elder .................................................................................................. 29

IX. The Appropriate Sentences ....................................................................... 32

A.  Nature and Circumstances of the Offenses ................................................ 33

B.  History and Characteristics of the Defendants ........................................... 35

1.  Elder .................................................................................................. 35

2.  Bryant ................................................................................................ 38

C.  Need for Specific Deterrence and Protect the Public ................................... 39

D.  General Deterrence and Need to Promote Respect for the Law ................... 40

E.  Restitution .......................................................................................... 40

X.  Conclusion .............................................................................................. 41

## PRELIMINARY STATEMENT

Because of the defendants, Ppassim Elder and Wilbert Bryant, a beloved patriarch—Hani Kasem—is dead. Motivated by greed, Elder sent Bryant and others to Hani and Mahmoud Kasem's store to extort them with a gun. As instructed, Bryant and his co-conspirators went to the store and brandished the firearm. One of them pistol-whipped Mahmoud Kasem and then another shot Hani Kasem in the face, severing his spinal cord and killing him. Elder and Bryant committed this heinous crime after having committed many others. And when they were caught, they each tried to obstruct the ongoing proceedings.

Elder and Bryant are now scheduled to be sentenced by this Court on February 8, 2023, following their convictions at trial for causing Hani Kasem's death through the use of a firearm,[1] extorting Mahmoud and Hani Kasem, as well as Ibrahim and Mohammed Rabah, multiple bank frauds, and other offenses. As set forth below, the government respectfully submits that the Court sentence Elder to a Guidelines sentence of life in prison[2] and Bryant to no less than 40 years' imprisonment. Nothing less will account for the seriousness of the defendants' crimes, promote respect for the law, and protect the public.

---

[1] As the Court is aware, the government subsequently moved to dismiss the firearms-related counts pursuant to recent guidance from the Department of Justice.

[2] As explained below, although none of Elder's offense convictions carry a maximum sentence of life, the Court may impose an effective life sentence by imposing consecutive sentences on multiple counts of conviction.

STATEMENT OF FACTS

Following a three-week trial in September and October 2021, the defendants were convicted of multiple offenses reflecting their years of crime, including bank frauds, extortions, and ultimately, murder.

I.      The Extortion of Mahmoud and Hani Kasem and Murder of Hani Kasem

In the fall of 2016, Hani Kasem and his son, Mahmoud, ran a small wholesale store in Ozone Park, Queens, called Garden Valley Distributors ("Garden Valley"), which supplied local delis and bodegas.  Mahmoud wanted to expand the business, but was unable to secure funding from his bank and began asking others in the Palestinian community for assistance.  Elder approached Mahmoud outside of a wedding and offered to meet at Garden Valley.  See Elder Presentence Investigation Report dated January 13, 2023 ("PSR") ¶ 28.[3] Elder subsequently met with Mahmoud on multiple occasions and offered to invest in Garden Valley.  To facilitate the investment, Elder requested that Mahmoud take checks from Elder, deposit them, and give certain amounts of cash back to Elder.  Two of the checks were issued by a company called Sajahtera Inc. and, unbeknownst to Mahmoud, represented proceeds of fraud, as described more below.  See PSR ¶¶ 29-30.  Mahmoud complied, and then used the remaining money, which he believed was Elder's investment in Garden Valley, to buy merchandise for the store.  Trial Tr. 93-94.

In February 2017, Elder asked Mahmoud to use the Garden Valley bank account to send a wire transfer.  Elder brought $100,000 in cash to Garden Valley and he and Mahmoud went to the local TD Bank branch.  After they arrived at the bank, Mahmoud had to go back

---

[3]      Except where otherwise noted, references to "PSR" are to Elder's PSR.

to his home to get certain identification, and by the time Mahmoud returned to the bank, the cash had been deposited and wired from the Garden Valley account to another company at Elder's direction.  See PSR ¶ 31.

Approximately a month later, Elder again asked Mahmoud to use the Garden Valley account, but this time Elder wanted to deposit $150,000 in cash.  Because Mahmoud had grown suspicious of Elder, he refused.  He instead asked that Elder sign a document indicating that the money deposited into the Garden Valley account was Elder's, which Elder refused to do.  Elder then demanded that Mahmoud repay the money Elder believed was left in the Garden Valley account from the deposited checks, which was approximately $40,000. Mahmoud, however, was unable to pay Elder because he had used the money to buy merchandise for the business.  Mahmoud offered to pay Elder in installments, but Elder refused, demanding all of the money immediately.  See PSR ¶¶ 32-33.

Elder then began a persistent campaign to threaten and extort Mahmoud and his family.  He threatened to shoot Mahmoud in the leg and to send "blacks" and "Hispanics" after him.  He hired Mahdi Abdel-Rahim, who recruited Mohammed Rabah, to throw rocks at the windows of the Kasem home.  The windshield of a vehicle parked in the Kasems' driveway was shattered.  Elder and another individual barged into the Kasem home, unannounced and without permission, yelling for Mahmoud.  That night, Elder and the other individual spoke with Hani for about 30 minutes.  Trial Tr. 589.  And in October 2017 – just weeks before Hani's murder – Elder threatened Hani in front of his wife, Fozieh Kasem, stating, "I'm going to do my job now."  See PSR ¶¶ 34-37.

During this period, Elder turned to Wilbert Bryant and Frederick McCoy for assistance in extorting the Kasems.  Elder met McCoy in 2011 when they were incarcerated

3

together on Rikers Island.  McCoy had known Bryant since approximately 1992, when they participated in a drug treatment program together following their release from state prison.  As explained more below, McCoy had introduced Elder to Bryant in 2012 so they could commit bank fraud together.  See PSR ¶ 38.

As to the scheme to extort Hani and Mahmoud, Elder recruited Bryant and McCoy beginning in July 2017.  Specifically, Elder offered Bryant and McCoy $10,000 to collect the money Elder claimed Mahmoud owed him.  Elder directed Bryant and McCoy to threaten Mahmoud (whom Elder referred to as a "cousin") and said that it would be best if they brought a gun.[4]  See PSR ¶ 39.  Specifically, Elder wanted Bryant and McCoy to "go with a gun to put the fear of God" into Mahmoud, and gave them the address for Garden Valley.  Trial Tr. 357.

In the weeks before the murder, Bryant and McCoy conducted surveillance of Mahmoud outside Garden Valley and called Elder to report back.  Because they did not have access to a gun, however, Bryant and McCoy recruited Dwayne Ling, who agreed to participate in the extortion and to obtain a firearm.  See PSR ¶¶ 40-41; Trial Tr. 362-66.

On October 23, 2017, Bryant, McCoy, and Ling drove to Garden Valley.  Mahmoud, Hani, and two of their employees were at the store that morning.  PSR ¶ 42.  Hani, who was suffering from kidney failure, did not go into the store every day at that time, but Mahmoud took him occasionally to get him out of the house and make him feel better.  Trial

---

[4]    Elder initially indicated that he would give McCoy a $1,000 down payment but ultimately only gave him $500, which McCoy split with Bryant.  See PSR ¶ 41.

4

Tr. 120-21.  On their way into the store that morning, Hani spoke on the phone with his wife, Fozieh, who was visiting Palestine.  Trial Tr. 620-21.

Once inside the store, McCoy approached Mahmoud and said they were there for Elder's money.  Bryant also stated they were there for Elder.  While McCoy spoke to Mahmoud, Ling brandished the gun and Bryant blocked the exit.  Tr. 124, 256-57, 277-78, 375.  Mahmoud responded that the matter did not concern them.  McCoy then took the gun from Ling and pistol-whipped Mahmoud above his left eye.  During the ensuing struggle, Bryant stayed at the door and told one of the employees not to touch her phone when she tried to call 911.  When another employee tried to run out of the store, Bryant tried to stop him.  See PSR ¶ 42.

Mahmoud and McCoy fought over the gun and the magazine, which had fallen from the firearm.  Ling picked up the gun and pointed it at Mahmoud.  At this point, McCoy left the store, walking back to his car.  Bryant and Ling fought inside the store with Hani.  Ling took the gun and fired it once, hitting Hani in the face, next to his mouth.  Bryant and Ling fled back to McCoy's car, where Ling said he did not mean to shoot anybody.  Mahmoud returned to the store to find his father on the ground in a pool of blood.  Hani was eventually rushed to the hospital, but the bullet had severed his spinal cord, leaving him unable to breathe without life support.  Trial Tr. 175-76.  After Fozieh returned to the United States, Hani was taken off life support and died.  See PSR ¶ 43; Trial Tr. 130, 621.

II.    The Bank Fraud Schemes

As mentioned, the money Elder gave to Mahmoud was proceeds of a fraud committed on Justin Rick.  Elder and Bryant, together with others, committed numerous bank fraud schemes in which co-conspirators opened bank accounts in their names but for Elder's

use. In addition to Bryant, Elder often used younger members of the Palestinian community to open these accounts, which were then used to commit various forms of fraud, including tricking individuals across the country into sending money for goods or services that were never provided. Typically, shortly after the account was opened, a victim would send his/her money to the account and Elder's co-conspirator would then quickly withdraw it in cash and give it to Elder, who let the co-conspirator keep a small percentage. In total, these accounts were then used to steal over $300,000 from victims.

### A.    Justin Rick

Justin Rick was a retired firefighter from California who operated certain rental properties. In November 2016, Rick identified two properties in Statesboro, Georgia that he wished to purchase, and hired a real estate agent, Laura Marsh, to assist. Believing he was effectuating the purchase, Rick was tricked into sending over $200,000 to a bank account in the name of Sajahtera Inc., which was controlled by Abdel-Rahim. Abdel-Rahim withdrew large amounts of this money and distributed it to Elder as directed, including by providing cashier's checks payable to Garden Valley. See PSR ¶ 22.[5]

### B.    Thomas Hardy

In 2012, McCoy introduced Elder to Bryant so they could commit bank fraud together. Specifically, Bryant opened an account at TD Bank in his name for Elder to use. In August 2012, shortly after the account was opened, an individual named Thomas Hardy from Oklahoma sent money to the account in Bryant's name. The wire transfer indicated that Hardy believed the money was in connection with a car-related transaction. See GX 209B, 209C;

---

[5]    As Rick testified, he recovered approximately $46,000 of this money.

6

Trial Tr. 849-50.  Less than one week after the transfer, Bryant withdrew $28,000 in cash over the course of three days.  McCoy was paid a $1,000 "finder's fee" for introducing Elder and Bryant and facilitating this crime.  See PSR ¶ 20.

C.    Cordell Newby

Mohammed Rabah participated in a similar bank fraud scheme with Elder. Specifically, Rabah opened an account at TD Bank in his name for Elder to use.  As he testified at trial, in January 2016, Cordell Newby, a then 78-year old car collector from Wenatchee, Washington, saw an ad on eBay for a classic car that he wanted to purchase, and the seller directed him to send $31,700 to the account in Rabah's name.  Newby was never provided the car. .  Instead of providing the fraud proceeds to Elder as agreed, however, Rabah stole Newby's money.  Elder threatened to kill Rabah and assaulted his brother, Ibrahim, to recover the criminal proceeds, as described further below.  See PSR ¶ 21.

D.    Amy Kronenthal

In August 2012, Elder, Bryant, and another co-conspirator, Ahmad Zahrieh, conspired and attempted to defraud JP Morgan customer Amy Kronenthal.  Specifically, unauthorized withdrawals were made from Kronenthal's account and then her personal information on her online account was changed.  For instance, her phone number was changed to a number belonging to Zahrieh.  In addition, her account twice tried to send over $1,000 to an account associated with Bryant's email address (although the transaction was canceled by JP Morgan Chase due to potential fraud).  See PSR ¶ 49.

E.    Other Victims

As mentioned, Elder committed similar schemes with other individuals, including Ahmad Zahrieh, his friend Justin Woods, and Abdelkareem Abu Zahrieh, who

opened accounts at JP Morgan Chase, Bank of America, TD Bank, People's United Bank, and Citibank for Elder's use. As described in the PSR, these were used to defraud multiple victims of over $100,000. See PSR ¶¶ 19, 23.

III.     The Extortion of the Rabah Family

The extortion and murder of Hani Kasem was not Elder's only violent crime. As mentioned above, in January 2016, Mohammed Rabah participated in a bank fraud scheme with Elder, which involved defrauding Cordell Newby of over $30,000 that Newby thought was going towards a classic car. Instead of providing the fraud proceeds to Elder as part of their scheme, Rabah withdrew $25,000 in cash without telling Elder. See PSR ¶ 25.

Like he later did with the Kasems, Elder turned to violence. He first threatened Mohammed, who refused to return the money. Elder, together with others, then went to Mohammed's house unannounced. Mohammed was not home but his brother Ibrahim was, along with Ibrahim's wife and two teenage daughters. Ibrahim answered the door and told Elder that Mohammed was not home. Elder said he wanted to "leave a message" for Mohammed and punched Ibrahim in the face, causing his nose to bleed. Elder continued to assault Ibrahim, punching him in the body and trying to drag him out of the house. Ibrahim's daughters heard the commotion and came to the door. They saw Elder punching their father and pleaded for him to stop. Elder only stopped once Ibrahim's daughters yelled Elder's daughter's name. See PSR ¶ 26. The police were called and observed Ibrahim's injuries, but Ibrahim refused medical attention, not wanting to leave his family alone. Trial Tr. 932-39, 961-62.

Still undeterred, Elder, together with his wife and their baby daughter, returned to the Rabah home that night. Elder's family requested that the Rabahs not involve police in

8

the incident, particularly because Elder's wife was a cousin of Ibrahim's wife.  The Rabahs agreed, but Elder still demanded repayment of the money Mohammed had stolen.  In the days after the assault, Elder repeatedly called Ibrahim's store, intimidating him, until eventually the Rabah family gathered up the money and paid Elder.  See PSR ¶ 27.

## IV.    The Defendants' Other Crimes

The extortion, murder, and frauds described above were not the only crimes the government proved at trial.

### A.    Extortion and Violent Offenses

As mentioned above, McCoy had introduced Elder and Bryant in 2012 so they could commit bank fraud.  When Elder contacted McCoy in 2017 regarding the scheme to extortion the Kasems, McCoy contacted Bryant because Bryant had previously agreed to collect money from an unknown individual for Elder.  As McCoy testified, Bryant told him that Elder had given Bryant a down payment for that extortion but Bryant was unable to recover the debt and so returned the money to Elder.  See PSR ¶ 45.

Elder also committed other acts of violence.  As mentioned above, in February 2013, Justin Woods, a friend of Zahrieh's, committed bank fraud with Elder.  But Elder claimed Woods owed him $1,000 and went to his home and threatened him while his wife was home.  Woods subsequently repaid the money.  See PSR ¶ 46.

Finally, Zahrieh testified that he once saw Elder holding a baseball bat at a cigar lounge.  Elder then bragged he had just used the bat to beat someone who owed Elder money. See PSR ¶ 47.

B.      Access Device Fraud

As proven at trial, between October 2016 and November 2016, Elder committed access device fraud by fraudulently creating credit cards with no names on them.  As one example, Elder gave these cards to Zahrieh to use, which on one occasion resulted in Zahrieh getting arrested.  When Zahrieh told Elder this, Elder simply laughed.  See PSR ¶ 48.

C.      Narcotics and Cigarette Trafficking

Between approximately 2012 and 2017, Elder sold marijuana and untaxed cigarettes with, among others, McCoy and Zahrieh.  See PSR ¶ 50.  In addition, McCoy used Bryant to try to help sell some of the unlawful cigarettes.  Trial Tr. 349.  The cigarettes, however, were not of sufficient quality and could not be sold.  Elder did send one pound of marijuana to Zahrieh.  PSR ¶ 50.

V.      The Defendants' Efforts to Obstruct Justice and Subsequent Crimes

The government unsealed its first indictment in this case on March 1, 2018, when Elder was arrested in Ohio.  Almost immediately thereafter, both Elder and Bryant took steps to try to obstruct the government's ongoing investigation and prosecution.

A.      Elder

While incarcerated in Ohio, on March 4, 2018, Elder called his brother Husam and discussed tampering with witnesses by trying to contact the Kasems to see if they would agree to not pursue the prosecution.  As Elder stated, this was his "strategy" to try to address the charges in this case:

PPASSIM:    I mean, we, we have to somehow civilize. There's gonna
            be a lot of no, and there's gonna be a lot of craziness but–

HUSAM:      We can't talk to the other side.  It's impossible.

10

PPASSIM:    Why?

HUSAM:    It's tampering.  Remember what happened with Hyka?

PPASSIM:    No, no, no, no.  I'm not talking about like that way, you. I mean, maybe Ali, or Fadel, somebody.

HUSAM:    They're not going to. I'm telling you. Do you not remember what happened with Hyka? Do you not learn from your past?[6]

PPASSIM:    I know, but there's no – that's only for me went directly. But if you went, or someone else went that's a different thing –

. . .

HUSAM:    Okay, look man. You want to do it, do it –

PPASSIM:    I can't do it.

HUSAM:    Hold on, hold on. They revoke the bail, we can't use the house again. You are aware of this right?

PPASSIM:    That's why I'm thinking – listen – ask, it doesn't hurt, ask Ali, Fadel, it doesn't hurt. Listen, as I said, you're going to get a lot of no's, maybe talk to Essam Delli or Emad Delli, they're close with them also. They're close with them, you know what I'm saying. You have to – somebody has to speak[7].   Talk to Uncle Essam, somebody, you know what I'm saying? So you, you not link. Say, "Hey listen . . ."

. . .

HUSAM:    You're thinking desperate.  You're not thinking logical.

PPASSIM:    I'm not thinking desperate or anything like that.  That's not what I'm doing. What I'm doing, I'm trying, I'm trying to think strategy.

---

[6]    As explained below, in April 2006, Elder was convicted of Reckless Endangerment and sentenced to one year in prison for violating an order of protection.  See PSR ¶ 124.

[7]    Underlined words are translated from Arabic.

11

GX 409-T; see also PSR ¶ 51.

Elder was eventually transferred to the Metropolitan Detention Center in Brooklyn ("MDC"), where he continued to commit crimes. Specifically, he offered McCoy tens of thousands of dollars to falsely exculpate Elder by telling law enforcement that Elder had nothing to do with the extortion and murder of Hani Kasem. Elder gave McCoy the name and description of another individual, who had previously died of a drug overdose, and who McCoy could say was involved instead of Elder. McCoy eventually declined Elder's offer. See PSR ¶ 52.[8]

Elder also used his time at the MDC to steal the identity of his then-attorney, Arthur Aidala, Esq., and lie to the Bureau of Prisons. Specifically, in March 2018, Elder had his relative, Mehmoon Elder, open a cell phone account for a specific number in the name of "Author Aidala," without Mr. Aidala's permission. Elder placed this number on his phone list at the MDC and falsely indicated it belonged to his attorney. Between March 2018 and May 2018, Elder, from the MDC, and Mehmoon, using the number, spoke with each other about, among other things, the fact that Elder was an "under the table" owner of a cryptocurrency business. See PSR ¶ 56.

During trial, Elder attempted to intimidate one of the prosecutors assigned to this case. On September 14, 2021, during jury selection, Elder spoke to one of the prosecutors (the "AUSA") while waiting to reenter the ceremonial courtroom. In the presence of multiple

---

[8] The government respectfully submits that this conduct was proven by at least a preponderance of the evidence at trial and therefore may be considered by the Court at sentencing. See generally United States v. Watts, 519 U.S. 148, 157 (1997); United States v. Vaughn, 430 F.3d 518, 527 (2d Cir. 2005); accord United States v. Gotti, 767 F. App'x 173 (2d Cir. 2019).

prosecutors, an FBI agent, co-defendant Wilbert Bryant, and United States Marshals officials, Elder offered "congratulations" to the AUSA on the recent birth of a child.  Elder said this in a threatening and intimidating manner to try to show the AUSA that he knew personal information about the AUSA.  See PSR ¶ 53.

B.      Bryant

Bryant was not arrested in March 2018 with Elder, McCoy, and Ling.  Rather, the government's investigation continued until it secured an indictment charging Bryant in December 2018.  On January 4, 2019, agents went to arrest Bryant at his apartment.  When the arrest team knocked on Bryant's door, he refused to open it, requiring law enforcement to force entry into the apartment.  Once the door was opened, law enforcement discovered Bryant in a shooting stance and an agent fired his weapon, missing Bryant.  As the arrest team quickly retreated, Bryant barricaded himself in the apartment and the arrest team had to call in the New York City Police Department's Emergency Service Unit ("ESU") for assistance.  Despite repeated requests by the ESU team, Bryant still refused to open the door to his apartment and threatened officers.  See PSR ¶ 54.[9]

When the ESU team finally forced its way into the bedroom where Bryant had barricaded himself, Bryant lunged at one of the officers with a knife. The ESU retreated from the bedroom and finally was able to subdue Bryant by drilling a hole through the wall of the bedroom and tasering him.  After officers removed Bryant from the floor, they saw he had left

---

[9]      As set forth below, Bryant objects to these factual assertions because they were not proven at trial.  The government therefore encloses the attached report from the FBI, which describes in detail Bryant's actions that day, see Exhibit A, as well as photographs of knives and burner phones found in Bryant's apartment, see Exhibits B-I, all of which the Court may rely on at sentencing.

behind a knife where his hands had been.  Inside the apartment, agents also recovered, among other things, three knives, including one with a handle resembling a firearm.  See PSR ¶ 55; see also Exhibits A-I.

## VI.    The Trial and Subsequent Proceedings

At the three-week trial, the government introduced testimony from 39 witnesses and admitted over 150 exhibits.  On October 1, 2021, the jury found the defendants guilty of all of the counts alleged against Elder and Bryant in the fifth superseding indictment except Count Fourteen for obstruction of justice alleged against Elder.  Among others, both defendants were convicted of Counts Nine and Ten, which charged unlawful use of a firearm and causing death through use of a firearm.  After trial, the defendants renewed their pretrial motion to dismiss Counts Nine and Ten, arguing that Count Eight was no longer a categorical crime of violence.  In accordance with guidance from the Department of Justice relating to the Supreme Court's decision in United States v. Taylor, 142 S. Ct. 2015 (June 21, 2022), the government moved to dismiss Counts Nine and Ten, and on November 9, 2022, the Court dismissed those counts.  The defendants therefore are to be sentenced on the following counts:

| Count | Defendant(s) | Description | Statutory Maximum Prison Term |
|---|---|---|---|
| 1 | Elder | Bank fraud conspiracy committed with Ahmad Zahrieh | 30 years |
| 2 | Elder, Bryant | Bank fraud conspiracy | 30 years |
| 3 | Elder | Bank fraud conspiracy committed with Mohammed Rabah | 30 years |

14

| 4 | Elder | Committing physical violence in furtherance of an extortion relating to Mohammed and Ibrahim Rabah | 20 years |
|---|---|---|---|
| 5 | Elder | Bank fraud conspiracy committed with Mahdi Abdel-Rahim | 30 years |
| 6 | Elder | Access device fraud | 10 years |
| 7 | Elder, Bryant | Extortion conspiracy relating to Hani and Mohammed Kasem | 20 years |
| 8 | Elder, Bryant | Committing physical violence in furtherance of an extortion relating to Hani and Mohammed Kasem | 20 years |
| 11 | Elder | Conspiracy to make false statements | 5 years |
| 12 | Elder | Making false statements | 5 years |
| 13 | Elder | Aggravated identity theft | Mandatory, consecutive sentence of 2 years |

VII.    Applicable Law

In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court set forth the

procedure that sentencing courts must follow in light of United States v. Booker, 543 U.S. 220,

258-60 (2005):

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

15

Gall, 552 U.S. at 49 (citation omitted).  Next, a district court must "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [a district court] may not presume that the Guidelines range is reasonable.  [A district court] must make an individualized assessment based on the facts presented."  Id. at 49-50 (citation and footnote omitted).

Section 3553(a) directs the sentencing court to consider the following factors, among others, when imposing a particular sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; and (C) to protect the public from further crimes of the defendant.

At sentencing, "the court is virtually unfettered with respect to the information it may consider."  United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988).  Indeed, Title 18, United States Code, Section 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  Thus, the Court must first calculate the correct Guidelines range, and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

16

VIII.   <u>The Guidelines</u>

      The government agrees with the Guidelines calculations set forth in the revised PSRs,[10] which are set forth below:

    A.   <u>Elder</u>

<u>Group 1</u> (Counts 1, 2, 3, and 5 – Conspiracy to Commit Bank Fraud; Count 6 – Access Device Fraud, <u>see</u> Guideline § 3D1.2(b))

| | |
|---|---|
| Base Offense Level (§ 2B1.1(a)(1)) | 7 |
| Plus:  Loss Amount Greater than $250,000 (§ 2B1.1(b)(1)(G)) | +12 |
| Plus:  Organizer or Leader (§ 3B1.1(a)) | +4 |
| Plus:  Obstruction of Justice (§ 3C1.1) | +2 |
| Adjusted Offense Level: | <u>25</u> |

<u>Group 2</u> (Counts 7(a), 8 – Extortion Conspiracy and Committing Physical Violence in Furtherance of an Extortion relating to Mahmoud Kasem, <u>see</u> Guideline § 3D1.2(b))

| | |
|---|---|
| Base Offense Level (§ 2B3.2(a)) | 18 |
| Plus:  Threat of Bodily Injury (§ 2B3.2(b)(1)) | +2 |
| Plus:  Amount Demanded Greater than $20,000 (§ 2B3.1(b)(7)(B)) | +1 |
| Plus:  Use of a Firearm (§ 2B3.2(b)(3)(A)(ii)) | +6 |
| Plus:  Bodily Injury (§ 2B3.2(b)(4)(A)) | +2 |
| Plus:  Organizer or Leader (§ 3B1.1(a)) | +4 |
| Plus:  Obstruction of Justice (§ 3C1.1) | +2 |
| Adjusted Offense Level: | <u>35</u> |

---

[10]   Although not reflected in their calculation of the Guidelines, the PSRs erroneously state that Elder and Bryant pleaded guilty.  <u>See</u> Elder PSR ¶ 68; Bryant PSR ¶ 57.

17

Group 3 (Count 7(b) – Extortion Conspiracy and Committing Violence in Furtherance of an Extortion relating to Hani Kasem, see Guideline § 3D1.2(b))

| | |
|---|---|
| Base Offense Level (§ 2B3.2(c)(1), § 2A1.1(a)) | 43 |
| Plus:  Organizer or Leader (§ 3B1.1(a)) | +4 |
| Plus:  Obstruction of Justice (§ 3C1.1) | +2 |
| Adjusted Offense Level: | <u>49</u> |

Group 4 (Counts 11, 12 – Conspiracy to Make False Statements, Making False Statements, see Guideline § 3D1.2(b))

| | |
|---|---|
| Base Offense Level (§ 2B1.1(a)(2)) | 6 |
| Plus:  Obstruction of Justice (§ 3C1.1) | +2 |
| Adjusted Offense Level: | <u>8</u> |

Group 5 (Count 4 – Committing Physical Violence in Furtherance of an Extortion relating to Mohammed and Ibrahim Rabah, see Guideline § 3D1.2(b))

| | |
|---|---|
| Base Offense Level (§ 2B3.2(a)) | 18 |
| Plus:  Threat of Bodily Injury (§ 2B3.2(b)(1)) | +2 |
| Plus:  Amount Demanded Greater than $20,000 (§ 2B3.1(b)(7)(B)) | +1 |
| Plus:  Bodily Injury (§ 2B3.2(b)(4)(A)) | +2 |
| Plus:  Organizer or Leader (§ 3B1.1(a)) | +4 |
| Plus:  Obstruction of Justice (§ 3C1.1) | +2 |
| Adjusted Offense Level: | <u>29</u> |

18

Multiple Count Adjustment

| Group/Count | Adjusted Offense Level | Units |
|---|---|---|
| Group 1 (Counts 1, 2, 3, 5, 7) | 25 | 0 |
| Group 2 (Counts 7(a), 8) | 35 | 0 |
| Group 3 (Count 7(b)) | 49 | 1 |
| Group 4 (Counts 11, 12) | 8 | 0 |
| Group 5 (Count 4) | 29 | 0 |

Total Number of Units:      1

Although the highest adjusted offense level is 49, the Guidelines provide that the total offense level cannot be higher than 43. See U.S.S.G. Ch. 5, Part A, n.2. With a Criminal History Category of VI, see PSR ¶ 127, this yields a Guidelines range of life in prison. However, Counts 1, 2, 3, and 5 carry a maximum statutory penalty of 30 years; Counts 4, 7 and 8 carry a maximum statutory penalty of 20 years; and Counts 11 and 12 carry a maximum statutory penalty of 5 years. "If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment." U.S.S.G. § 5G1.2(d); see also id. app. n1. ("If no count carries an adequate statutory maximum, consecutive sentences are to be imposed to the extent necessary to achieve the total punishment.").

In addition, the Court must impose a two-year sentence on Count 13 to run consecutive to any other sentence. See id. § 5G1.2(a); see also 18 U.S.C. § 1028A.

19

B.    Bryant

Group 1 (Counts 7(a), 8 – Extortion Conspiracy and Committing Physical Violence in Furtherance of an Extortion relating to Mahmoud Kasem, see Guideline § 3D1.2(b))

| | |
|---|---|
| Base Offense Level (§ 2B3.2(a)) | 18 |
| Plus:  Threat of Bodily Injury (§ 2B3.2(b)(1)) | +2 |
| Plus:  Amount Demanded Greater than $20,000 (§ 2B3.1(b)(7)(B)) | +1 |
| Plus:  Use of a Firearm (§ 2B3.2(b)(3)(A)(ii)) | +6 |
| Plus:  Bodily Injury (§ 2B3.2(b)(4)(A)) | +2 |
| Plus:  Obstruction of Justice (§ 3C1.1) | +2 |
| Adjusted Offense Level: | <u>31</u> |

Group 2 (Count 7(b) – Extortion Conspiracy and Committing Violence in Furtherance of an Extortion relating to Hani Kasem, see Guideline § 3D1.2(b))

| | |
|---|---|
| Base Offense Level (§ 2B3.2(c)(1), § 2A1.1(a)) | 43 |
| Plus:  Obstruction of Justice (§ 3C1.1) | +2 |
| Adjusted Offense Level: | <u>45</u> |

Group 3 (Count 2 – Conspiracy to Commit Bank Fraud)

| | |
|---|---|
| Base Offense Level (§ 2B1.1(a)(1)) | 7 |
| Plus:  Loss Amount Greater than $15,000 (§ 2B1.1(b)(1)(C)) | +4 |
| Plus:  Obstruction of Justice (§ 3C1.1) | +2 |
| Adjusted Offense Level: | <u>13</u> |

20

Multiple Count Adjustment

| Group/Count | Adjusted Offense Level | Units |
|---|---|---|
| Group 1 (Counts 7(a), 8) | 31 | 0 |
| Group 2 (Count 7(b)) | 45 | 1 |
| Group 3 (Count 2) | 13 | 0 |

Total Number of Units:        1

As with Elder, although the highest adjusted offense level is 45, the Guidelines provide that the total offense level cannot be higher than 43.  See U.S.S.G. Ch. 5, Part A, n.2. With a Criminal History Category of I, see PSR ¶ 93, this yields a Guidelines range of life in prison, PSR ¶ 133.  The statutory maximum penalties are: 30 years in prison for Count 2 and 20 years in prison for Counts 7 and 8.  As explained above, the Guidelines direct the Court to impose consecutive sentences if required to achieve an appropriate, total punishment.  See U.S.S.G. § 5G1.2(d); id. app n.1.

C.    The Defendants' Guidelines Objections

Both defendants raise various objections to the Guidelines calculations set forth in the revised PSRs, none of which have any merit.  See ECF Nos. 452, 454 (Bryant); ECF No. 452 (Elder).[11]  The Court need not resolve these Guidelines disputes if they would not affect the Court's ultimate sentence.  See Fed. R. Crim. Proc. 32(i)(3)(B) (stating that the court may decline to resolve any sentencing dispute if it "determine[s] that a ruling is unnecessary . . . because the matter will not affect sentencing").  Should the Court decide to

---

[11]    The defendants each join in the other's objections to the extent the objection is relevant to both PSRs.

address these objections, however, the government respectfully submits that they should all be denied.

1.    Joint Objections

The defendants jointly assert the following objections: (1) Count Seven should not be divided into two subparts because Hani Kasem "was a bystander, and not the subject of the alleged extortion;" (2) despite its plain text, the extortion Guideline (§ 2B3.2(c)(1)) should cross-reference to the Second Degree Murder Guideline (§ 2A1.2) rather than the First Degree Murder Guideline (§ 2A1.1); and (3) the two-level increase for an express threat of bodily injury to the offense level for the extortion of Mahmoud Kasem should not apply because the threat of bodily injury is contemplated by the statutory offense, and the increase is duplicative of the two-level increase for actual bodily injury and the six-level increase for use of a firearm. These objections miss the mark.

First, the PSR appropriately considers Count Seven separately as to Hani Kasem and Mahmoud Kasem under U.S.S.G. § 1B1.2(d).  Bryant appears to argue that the harm caused to Hani—his death—cannot be considered because Hani "was a bystander, and not the subject of the alleged extortion."  Bryant PSR Obj. 2.  This is factually and legally incorrect. First, Bryant ignores that Counts Seven and Eight specifically alleged, and the jury found, that Bryant and Elder agreed to extort both Hani and Mahmoud Kasem.  See Verdict Sheet, ECF No. 361 at 3.  In addition, as established at trial, Mahmoud and Hani together owned Garden Valley, and Elder wanted the return of money that had been deposited into the Garden Valley bank account, over which Hani Kasem had signatory authority.  See GX 206(A) (Garden Valley Bank account opening document).  As part of the extortionate scheme, Elder had others throw rocks at the home where Hani and Mahmoud both lived, and then barged into their home

22

and spoke to Hani for half an hour when Mahmoud was not there. Just a few weeks before the murder—and after he had recruited Bryant and McCoy into the scheme—Elder threatened Hani personally, stating, "I'm going to do my job now." And during the course of the extortion, Hani was threatened with a gun and murdered at his store. This evidence shows that Hani was a victim of the proven extortion scheme.

In any event, even if Hani were somehow a "bystander" and "not the subject" of the proven extortion, the Guidelines would nevertheless account for his murder under U.S.S.G. § 2B3.2(c)(1), which directs that the murder Guideline be applied "[i]f a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111." The Second Circuit has made clear that a "victim" for purposes of this cross-reference includes "all persons killed to carry out the extortion scheme," and is not limited "direct" victims of the extortion. United States v. Mulder, 273 F.3d 91, 117-18 (2d Cir. 2001). Accordingly, even assuming that Hani Kasem was not a direct victim of the scheme—which he was—he was killed during the commission of the extortion and the murder Guideline applies. The defendants' arguments are therefore without merit.

Second, the PSR properly applies the cross-reference at U.S.S.G. § 2B3.1(c)(1), which states that "[i]f a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States, apply § 2A1.1 (First Degree Murder)." Bryant claims that despite the provision's text, if the killing constituted Second Degree murder under § 1111, then the Second Degree Murder Guideline, § 2A1.2, should apply. But § 2B3.2(c)(1) clearly and unambiguously states any killing during the course of an extortion that satisfies § 1111—which includes both First and Second Degree murder—cross-references to the First Degree Murder

23

Guideline § 2A1.1.  Had the Sentencing Commission wished to differentiate between First and Second Degree murders in this provision, it could have done so.  "Where, as here, the language of the Guidelines provision is plain, the plain language controls."[12]  United States v. Taylor, 961 F.3d 68, 75 (2d Cir. 2020) (quoting United States v. Mingo, 340 F.3d 112, 114 (2d Cir. 2003) (per curiam)); see also  United States v. Millar, 79 F.3d 338, 346 (2d Cir. 1996) ("As with statutory language, the plain and unambiguous language of the Sentencing Guidelines affords the best recourse for their proper interpretation.").[13]

Third, the two-level increase for threat of bodily injury relating to the offense level for the extortion of Mahmoud Kasem is appropriate.  Contrary to the defendants' assertions, the threat of bodily injury is not already incorporated into the base offense level for the offense of conviction.  The relevant Guideline makes clear that it applies "if there was any

---

[12]  The Sentencing Commission's rationale for enacting this unambiguous provision may reflect a policy judgment that killings committed during the course of any felony—which, as the Court has previously found, constitutes Second Degree Murder under § 1111, see Mem. & Order, ECF Dkt. No. 404, at 15—should be punished more harshly than other killings that constitute Second Degree Murder, such as where a defendant was aware of a risk of serious bodily harm, which are governed by § 2A1.2.

[13]  Bryant argues in the alternative that if § 2A1.1 applies, the Court should downwardly depart and apply a base offense level of 38, which applies to Second Degree murder.  Bryant PSR Obj. at 4.  Bryant correctly points out that § 2A1.1 app. n.2(B) states that if a defendant "did not cause the death intentionally or knowingly, a downward departure may be warranted."  Of course, whether through a Guidelines departure or under § 3553(a), the Court should consider the fact that neither Elder nor Bryant intended to kill Hani Kasem nor were they the ones who fired the fatal shot.  But as explained herein, the defendants' actions— knowingly employing a firearm to extort Mahmoud Kasem in his place of business, with multiple innocent victims present, in addition to all the other misconduct adduced at trial— warrant the requested sentences.  Cf. U.S.S.G. § 2A1.1 app.2(B) (providing that the extent of any departure "should be based upon the defendant's state of mind (e.g., recklessness or negligence), the degree of risk inherent in the conduct, and the nature of the underlying offense conduct").

24

threat, express or implied, that reasonably could be interpreted as one to injure a person or physically damage property, or any comparably serious threat, such as to drive an enterprise out of business." Guideline § 2B3.2, application note 2 (emphasis added). Accordingly, the base offense level does not account for an express threat of bodily injury. Further, the two-level increase is not impermissibly duplicative of the two-level increase for actual bodily injury or the six-level increase for use a firearm. Guideline § 2B3.2 accounts for each of these distinct harms with incremental offense level increases. Indeed, the Guideline expressly contemplates that the increases for use of a firearm and actual bodily injury will be counted "cumulatively" and caps their cumulative increase at 11 levels. The defendants do not, and could not, cite to any authority for their assertion that these offense level increases are duplicative.

2. <u>Bryant</u>

Bryant individually argues the following: (1) he should be granted a two-point reduction for having a minor role in the extortion offenses under U.S.S.G. § 3B1.2(b); and (2) his decision to barricade himself for hours and attempt to stab an arresting officer does not constitute obstruction of justice under U.S.S.G. § 3C1.2. These arguments, too, are without merit.

<u>First</u>, Bryant was not a minor participant in the extortion scheme. As proven at trial and described above, Bryant:

i. met with Elder, with whom he had previously tried to extort another individual, and McCoy to discuss the scheme in July 2017, nearly three months before the murder;

ii. agreed that a gun would be used to commit the extortions;

iii. agreed to split the $10,000 payment promised by Elder for extorting the Kasems;

25

iv.     did receive half of the $500 down payment paid by Elder;

v.      was present when Ling agreed to participate in the scheme and indicated he had obtained the gun;[14]

vi.     went to Garden Valley on October 23, 2017 with McCoy and Ling;

vii.    walked into the store behind McCoy but before Ling;

viii.   affirmatively said that he and his co-conspirators were there for Elder;

ix.     was present when Ling pulled a gun out and when McCoy pistol-whipped Mahmoud Kasem;

x.      stood by the door to ensure no one entered or exited during the extortion;

xi.     instructed one of the victims not to touch her phone during the encounter;

xii.    tried to stop another victim when he ran out of the store;

xiii.   did not leave the store when McCoy did, and instead fought with Hani Kasem as Ling shot him; and

xiv.    got back into the getaway car.

Given these facts, Bryant has not met his burden—by a preponderance of the evidence—that his conduct was "minor" as compared to "the average participant" in an extortion.  United States v. Carpenter, 252 F.3d 230, 235 (2d Cir. 2001) (internal quotation marks omitted).  As the Second Circuit has made clear, a role reduction "will not be available simply because the defendant played a lesser role than his co-conspirators."  United States v. Solis, 18 F.4th 395, 402 (2d Cir. 2021) (quoting Carpenter, 252 F.3d at 235).  As set forth above, Bryant was a key

---

[14]   As McCoy testified, given Elder's request that he and Bryant use a gun to extort Mahmoud Kasem, McCoy thought to recruit Ling, who had access to a gun, into the scheme. But Bryant discussed this with McCoy and Ling, and was aware that was why Ling was present on October 23, 2017.  (Cf. Bryant PSR Obj. Ltr. at 1 (arguing that "there is no basis to assert that Mr. Bryant recruited others or Dwayne Ling into the scheme)).

participant in the initial stages of the scheme, months before the murder; knew the full scope of the illicit agreement, including that a firearm would be used; agreed to be compensated the same amount as McCoy; and was an active participant on October 23, 2017. The fact that he did not handle the weapon does not mean that he is entitled to a role reduction.[15]

Second, Bryant claims there is an insufficient factual basis to apply the obstruction of justice enhancement under Guideline § 3C1.2 because "no testimony was offered at the parties' trial regarding the circumstances of Mr. Bryant's arrest." Bryant PSR Objs. at 2. Given Bryant's apparent attempt to contest the factual allegations in the PSR, the government hereby provides the enclosed photographs and reports, which describe in detail Bryant's actions on the morning of January 4, 2019. See Exs. A-I. Specifically, as detailed in the attached report, Bryant barricaded himself behind a mattress in his bedroom. When Emergency Services Unit personnel requested that he come out with his hands up, Bryant threatened to kill the police canine and told law enforcement they were "going to have to hurt him." When ESU personnel opened the bedroom door, Bryant charged at them with a knife. The attached photographs include photographs of three knives and several burner phones recovered from Bryant's apartment.

As the Second Circuit has explained, "[t]here is no per se right to a Fatico hearing, and trial courts enjoy broad discretion in determining what procedures to employ at

---

[15]    In urging otherwise, Bryant attaches prior, unaccepted plea offers extended by the government. Bryant did not plead guilty, and the Guidelines calculations contained in unexecuted agreements do not bind the government or the Court. At this stage, after a full record developed at trial and the Probation Department's issuance of the PSR, the prior plea agreements should carry no weight with the Court.

27

sentencing." United States v. Rutigliano, 614 F. App'x 542, 547 (2d Cir. 2015); see also United States v. Slevin, 106 F.3d 1086, 1091 (2d Cir. 1996) (providing that a "court is not required, by either the Due Process Clause or the federal Sentencing Guidelines, to hold a full-blown evidentiary hearing in resolving sentencing disputes. All that is required is that the court afford the defendant some opportunity to rebut the Government's allegations" (internal quotation marks and citations omitted)). Further, "[b]oth the Supreme Court and [the Second Circuit] . . . have consistently held that the right of confrontation does not apply to the sentencing context and does not prohibit the consideration of hearsay testimony in sentencing proceedings." United States v. Martinez, 413 F.3d 239, 242 (2d Cir. 2005) (collecting cases); see also, e.g., United States v. Bedell, 590 F. App'x 86, 87 (2d Cir. 2015) (no error in relying on "excerpts of recorded interviews conducted with two of [the defendant's] female co-conspirators and drug customers" at sentencing); United States v. Martinucci, 561 F.3d 533, 535 (2d Cir. 2009) (no error in district court's consideration of deposition testimony of defendant's victims); United States v. Garcia, 167 F. App'x 259, 261 (2d Cir. 2006) (rejecting argument that district court improperly considered hearsay testimony of a cooperating witness who testified at the trial of the defendant's co-defendant); United States v. Brinkworth, 68 F.3d 633, 640-41 (2d Cir. 1995) (stating that "oral and written statements" and a chance to submit evidence constitute "adequate opportunity" to challenge a sentence).

Under these standards, the attached photographs and reports are more than sufficient for the Court to make its necessary findings that Bryant "recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from

a law enforcement officer," which includes "in the course of resisting arrest."  U.S.S.G. § 3C1.2, app. n.3.[16]

      3.    <u>Elder</u>

Elder individually raises the following objections: (1) Paragraph 47 describing Elder holding a baseball bat and bragging about having used it to beat someone who owed him money should be stricken; (2) none of the enhancements for obstruction of justice should apply given that he was acquitted of obstruction of justice at trial; and (3) there is no basis for the enhancements for his leadership role in various offenses.[17]

<u>First</u>, as to Elder's objection to Paragraph 47, Elder is incorrect that there was no evidence about the baseball bat at trial.  To the contrary, Ahmad Zahrieh testified to the following:

Q:    Did you ever see Mr. Elder with any weapons?

A:    I saw him with a bat once.

Q:    And where was this?

A:    At Myst.

Q:    And what did you see?

A:    There was things on the bat, but I really couldn't tell because it was dark.

Q:    Do you know why Mr. Elder was holding this bat?

---

[16]    Should the Court nevertheless deem a <u>Fatico</u> hearing necessary, the government is prepared to prove these allegations.

[17]    Elder also raises objections relating to his criminal history category.  The government understands that the Probation Department is preparing an addendum that will address those objections.

A:    He was upset that someone owed him money.

Q:    Did he say anything?

A:    He said someone owes me $2,000, and I went to go beat him up and got my money back.

Q:    What was his demeanor like when he said that?

A:    He was pissed.

Trial Tr. 699-700.  Accordingly, Paragraph 47 should remain in the PSR.

Second, Elder's objections to the obstruction of justice enhancements are similarly without basis.  As detailed above, after his arrest, Elder (1) called his brother Husam from jail and urged his brother to find intermediaries willing to tamper with witnesses by trying to contact the Kasem family to see if they would agree to not pursue the prosecution; (2) offered to pay Frederick McCoy tens of thousands of dollars to falsely exculpate Elder by telling law enforcement that Elder had nothing to do with the extortion and murder of Hani Kasem; and (3) threatened the AUSA during jury selection.

Elder's attempts to minimize and otherwise attack the evidence supporting the related obstruction enhancements should be rejected by the Court.  First, Elder argues that "it would not have been obstruction of justice to merely find out whether [the Kasems] intended to blame the killing on Mr. Elder."  Elder Objs. 5.  But Elder was not simply wondering whether the Kasem family "intended to blame" him for Hani Kasem's death:  he was attempting to get his brother or someone else to persuade the Kasem family not to cooperate with the investigation.  Indeed, his own brother refers to Elder's plan as "tampering" and Elder states that he is "trying to think strategy."

30

Elder also argues that he was acquitted of Count Fourteen for obstruction of justice at trial. But it is well settled that this Court may consider acquitted conduct in determining the sentence, provided that the conduct as proven by at least a preponderance of the evidence. See, e.g., United States v. Vaughn, 430 F.3d 518, 527 (2d Cir. 2005) ("[D]istrict courts may find facts relevant to sentencing by a preponderance of the evidence, even where the jury acquitted the defendant of that conduct."). Here, the government admitted ample evidence of Elder's efforts to obstruct justice, including the recorded call described above and McCoy's testimony about Elder's offer to pay him and the contemporaneous notes that McCoy wrote with the details of the individual Elder wanted McCoy to blame.[18]

Finally, Elder's arguments against his role adjustments are also meritless. With respect to the role enhancement for the bank fraud conspiracies, the Guidelines make clear that a defendant's role in the offense is to be considered with reference to the entire group, not with reference to each individual count of conviction within a group. See U.S.S.G. § 3B1.1, introductory commentary ("The determination of a defendant's role in the offense is to be made on the basis of all conduct within the scope of § 1B1.3 (Relevant Conduct), i.e., all conduct included under § 1B1.3(a)(1)-(4), and not solely on the basis of elements and acts cited in the count of conviction."). Here, the jury found Elder guilty of four counts of bank fraud conspiracy. As proven at trial, Elder was the mastermind behind, and main beneficiary of, each of these grouped bank fraud conspiracies. Moreover, the scheme involved at least five people: Elder, Bryant, Abdel-Rahim, Rabah, Zahrieh, and McCoy (who received a

---

[18]    To the extent Elder also argues that he did not intend to threaten the AUSA, the government attaches under seal a report detailing the interaction, including Elder's "menacing" tone, see Exhibit J, on which this Court can rely in sentencing Elder.

finder's fee for facilitating the offense). In any event, the conduct would certainly qualify as "extensive" under Guideline § 3B1.1(a) in that the victims included several banks and numerous innocent people throughout the United States who were defrauded during sophisticated schemes of over $300,000.

The role enhancements for the extortions of Mahmoud and Hani Kasem are also warranted despite Elder's contentions to the contrary. Elder does not and cannot dispute that he organized and led the extortion of Mahmoud and Hani Kasem. And, as proven at trial, Elder recruited Bryant, Ling, McCoy, Abdel-Rahim (who in turn recruited Rabah)[19] and the unknown individual who barged into the Kasem home with Elder to help him extort the Kasem family. Moreover, and contrary to Elder's assertions, his extortionate activity was not "limited to only making a loan or investment and the demand for repayment by threat of and use of force or violence." Elder Objs. 8. Elder engaged in a persistent campaign to threaten and extort the Kasems, which started in approximately March 2017 and culminated in Hani's murder in October 2017. Elder threatened Mahmoud via text and phone call, he sent people to throw rocks at the Kasem's home, he threatened Hani at a wedding, and then he hired Bryant, Ling, and McCoy to go to Garden Valley with a gun. An aggravated role enhancement is warranted.

IX.    The Appropriate Sentences

As set forth below, each Section 3553(a) factor weighs strongly in favor of the requested sentences. The defendants participated in a gun-point extortion, resulting in the

---

[19]    Although Elder may not have known about Mohammed Rabah's involvement, Rabah did in fact further the extortion by helping Abdel-Rahim throw rocks at the Kasem family's windows.

32

senseless murder of the patriarch of a family, as well as a multitude of other offenses. When caught, they both tried to obstruct the ongoing proceedings. And they did so despite both having served significant prison terms. An effect life sentence as to Elder and no less than 40 years as to Bryant would be sufficient, but not greater than necessary, to achieve the purposes of sentencing.

A.    Nature and Circumstances of the Offenses

The serious nature and circumstances of the offenses cannot be overstated. See 18 U.S.C. § 3553(a)(1), (2)(A). The extortion and murder of Hani Kasem alone is a heinous act of violence motivated by pure greed that warrants an extremely significant sentence. Elder first used Mahmoud Kasem to unwittingly help him launder fraud proceeds, and when Mahmoud eventually refused to keep doing so, Elder resorted to threats and violence. After repeated threats and acts of intimidation, Elder turned to Bryant and McCoy, with whom he had previously committed other crimes, including an attempted extortion.

The defendants elected to use a gun in attempt to force Mahmoud to pay Elder. This led to the fateful events of October 23, 2017, when Bryant and his co-conspirators, at Elder's direction, entered the Garden Valley store. Bryant stood by the door, said they were there for Elder, instructed a victim not to touch her phone when she tried to call 911, tried to keep another victim inside the store and struggled with Hani Kasem. Although neither Elder nor Bryant personally fired the gun that killed Hani Kasem, their choices and actions directly caused his death. Because of them, Hani Kasem—an elderly man, committed to his family and suffering from kidney failure—was brutally murdered. Mahmoud, thinking he had successfully chased the perpetrators out of the store, came back to find his father lifeless on the floor.

33

The impact of the murder on the Kasem family is unfathomable. As detailed by members of the Kasem family, because of the defendants' greed, Hani Kasem was absent at his daughter's wedding, his grandson's wedding and for the births of grandchildren and great-grandchildren. The Kasem family will mourn his absence for the rest of their lives.[20]

If the defendants were to be sentenced for only this conduct, a significant sentence would be warranted. But as proven at trial, the nature and circumstances of their other offenses require an even more severe punishment.

Elder and Bryant committed bank fraud in which they lied to TD Bank, falsely stating that the bank account would be used by Bryant when in fact it would be controlled by Elder. This permitted the account to be used to defraud an individual of over $30,000, which was sent into the account and quickly thereafter withdrawn by Bryant in cash. This was part of Elder's broader scheme in which he used many others to open accounts in his name to commit fraud, including Justin Rick, a retired firefighter defrauded of $200,000, and Cordell Newby, an elderly car collector who was swindled out of over $30,000.

But Hani Kasem, Justin Rick and Cordell Newby were not Elder's only victims. Elder viciously assaulted Ibrahim Rabah, in front of his two teenage daughters, because Ibrahim's brother refused to hand over fraud proceeds, stopping only because Ibrahim's daughters called out Elder's daughter's name. Elder and his family then convinced the Rabah family not to involve the police or pursue charges, but still forced them to pay Elder the illicit

---

[20] The government will separately submit several victim impact statements from members of the Kasem family along with a list of Kasem family members who wish to speak at sentencing under seal.

34

gains (over half of which were paid by members of the Rabah family other than Mohammed, out of their own pockets).

This pattern – fraud, violence, and obstruction – continued after Elder's arrest. Elder tried to tamper with witnesses, lied to the Bureau of Prisons, stole his attorney's identity, and tried to intimidate a prosecutor during trial. Bryant too obstructed agents' attempt to arrest him, barricading himself inside his apartment and lunging at an officer with a knife, one of many he had in his apartment.

The defendants' crimes were violent and deceitful. They were motivated by greed and harmed many innocent people, including the entire Kasem family and the Rabah family. They warrant an extremely significant prison sentence.

B.     History and Characteristics of the Defendants

The defendants' history and characteristics also weigh in favor of the requested sentences. See 18 U.S.C. § 3553(a)(1).

1.     Elder

As explained above and proven at trial, Elder committed a wide variety of crimes for years. But these are in addition to multiple prior convictions for extremely violent and fraudulent offenses, resulting in significant terms of imprisonment.

Elder was first arrested in March 2000 and convicted of Grand Larceny in the Fourth Degree, a felony. In that case, Elder and others charged over $40,000 worth of merchandise on fraudulently obtained credit cards, and Elder was sentenced to five years' probation. PSR ¶ 119. Elder violated his probation and in April 2004, when he was convicted of tax offenses in New Jersey.

35

In March 2005, he was sentenced to two to four years' imprisonment following his conviction of Criminal Possession of Stolen Property in the Third Degree for possessing 10 stolen credit cards. See PSR ¶¶ 120-21. During this stint in prison, Elder was cited for three infractions, including issuing threats, refusing a direct order, and failing to comply with a hearing disposition. See PSR ¶ 121.

The next year, in March 2006, Elder was sentenced to 18 months to 3 years' imprisonment following another conviction for Criminal Possession of Stolen Property, this time in the Fourth Degree, for possessing a stolen credit card.[21] See PSR ¶ 122.

One month later, in April 2006, Elder was sentenced to another year of imprisonment, the maximum following his conviction for Criminal Mischief, a Class A misdemeanor. In that case, Elder rammed his vehicle into another individual's car six times, causing the victim to suffer injuries to their head and neck. Elder fled the scene and was arrested a week later. See PSR ¶ 123. While incarcerated for the offense, Elder continued to thumb his nose at the law, this time by violating an order of protection, for which he was convicted of Reckless Endangerment in the Second Degree. As Elder and his brother Husam recounted during the call on March 4, 2018 excerpted above, Elder "called [the victim] from Rikers Island," of which Husam reminded Elder when trying to convince him not to tamper with the Kasem family. See GX 409-T. As with the Criminal Mischief conviction, Elder was sentenced to the maximum of one year in custody in April 2006. See PSR ¶ 124. For all of

---

[21]     Elder has never filed a personal income tax return with either the IRS or the New York State Department of Taxation and Finance despite admittedly earning hundreds of thousands of dollars in trading Bitcoin, selling refurbished cellphones and sneakers, and partially owning a hookah lounge. See PSR ¶¶ 145-47.

these offenses, Elder was released from prison in December 2007 and discharged from parole in March 2009.

Two years later, in March 2011, Elder was again arrested, this time for a vicious assault on a neighbor. Elder grabbed the victim and threw him down a flight of stairs. He stomped and kicked him and lifted him up and began punching him in his stomach, body, and head. Elder then threw the victim down a second flight of stairs and continued to kick and stomp him. During the assault, Elder threatened to kill the victim if he called the police. As a result of this violent attack, the victim suffered a fractured wrist, a fractured tibia, an abdomen wall contusion, and cuts and bruises on his neck, back, head, and ear and had to undergo surgery. Elder was ultimately convicted of Assault in the Third Degree and sentenced to the maximum of one year in custody.

In addition to trying to tamper with witnesses, stealing his attorney's identity, and lying to the MDC, Elder has incurred at least 11 infractions while in pretrial detention. These range from multiple abuses of the telephone system, refusing to obey multiple orders, interfering with taking count, refusing an assignment, giving or accepting money without authorization, and being unsanitary. PSR ¶ 138.

Elder's myriad crimes cannot be attributed to his upbringing. Rather, he chose to repeatedly break the law despite having a "good childhood in a loving home with a 'great family'" that was "devoid of any forms of abuse or any significant financial struggles." PSR ¶ 135. He shares a close relationship with his mother as well as his nine siblings and half-siblings, who are all supportive of him. See PSR ¶¶ 132-34. Elder's wife is employed and able to support their children in his absence. See PSR ¶ 136. Elder is in good health, has no history of serious medical conditions (aside from suffering some panic attacks since his

37

incarceration that are treated with "placebo medication") and has no history of substance or alcohol abuse.  PSR ¶¶ 140-42.

All of this demonstrates Elder's true history and characteristics—that he is a lifelong, violent conman motivated by greed.

2.    Bryant

Bryant's history and characteristics also weigh in favor of the requested sentence.  In 1983, Bryant was sentenced to 18 months to 54 months in custody, having been convicted of Robbery in the Second Degree.  Following his release from custody, Bryant was again arrested and sentenced in May 1992 to 18 months to 3 years in custody, this time following his conviction for Attempted Robbery in the Third Degree.  In that case, the defendant forcibly removed property from a victim's pocket and when he was apprehended by police, he punched the arresting officer in the face, cutting him.  See Bryant PSR ¶¶ 91-92.  It was after release from custody this time that Bryant first met Frederick McCoy.

Although Bryant was not arrested again until the instant offense, the evidence presented at trial proved that he continued to commit crimes during the intervening period.  For instance, Bryant helped McCoy try to sell unlicensed cigarettes and committed bank fraud with Elder in 2012, tried to help Elder collect on another debt, and of course participated in the extortion and murder of Hani Kasem in 2017.

But Bryant did not need to commit these crimes to survive financially.  Since 1996, he had been a taper and member of a union, which afforded him benefits, work, and pay of nearly $50 an hour.  He was driving a BMW at the time of his arrest and had an annuity fund from his employment.  See Bryant PSR ¶¶ 121, 124-25.  These circumstances show that, like Elder, his crimes were motivated by greed.

38

Bryant's history and characteristics are perhaps best exemplified by his actions on the day of his arrest in this case. After refusing to open the door for agents, Bryant assumed a shooting stance and, after an agent fired his weapon, he barricaded himself in his room. Bryant refused to come out for hours, instead lunging at an officer with a knife, which was eventually recovered underneath his body. And Bryant possessed other weapons, including a knife with a handle in the shape of a firearm. Thus, even after participating in the murder of Hani Kasem, Bryant continued to possess weapons and actively obstructed agents' attempts to arrest him. All of these history and characteristics demonstrate the need for a significant sentence.

C.      Need for Specific Deterrence and Protect the Public

The requested sentences are also needed to protect the public and specifically deter the defendants from committing further crimes. See 18 U.S.C. § 3553(a)(2)(B), (C).

Elder has been arrested no fewer than seven times, sustaining prior convictions resulting in multiple, significant terms of imprisonment and probation. None of that served to deter him from committing the instant offenses, which occurred over many years and included acts of violence and fraud. Even being arrested by the FBI, charged with murder, and placed in federal custody did not stop Elder from committing crimes. Undeterred, he thereafter stole his attorney's identity, lied to the Bureau of Prisons, tried to tamper with multiple witnesses, attempted to intimidate a prosecutor, and sustained 11 disciplinary infractions.

There is no reason to think that if Elder were released he would stop breaking the law. In fact, he may well continue to do so even while incarcerated, as he has done time and time again. The only way to try to protect the public from Elder, and to deter him from committing any more crimes, is by imposing a life sentence.

39

Bryant also has not been deterred by his prior convictions. Although from many years ago, Bryant was twice convicted of robbery-related offenses and sentenced to two significant terms of imprisonment. In connection with one of those arrests, he assaulted the arresting officer. Here, too, Bryant tried to assault an arresting officer, barricading himself in his room and forcing police to use a Taser to extract him. These actions reveal a concerted disregard for the law, one that requires a significant term of imprisonment to both deter him from committing any more crimes and to protect the public.

D.    General Deterrence and Need to Promote Respect for the Law

Finally, general deterrence and the need to promote respect for the law weigh strongly in favor of the requested sentences. The defendants committed a gunpoint extortion that resulted in the murder of an innocent businessman. As a result of their actions, a son found his father lifeless in his store; a wife rushed home to find her husband in a hospital on life support; and a family lost its patriarch.

The defendants committed this murder not in isolation but after previously serving time in prison for violent offenses, and after committing multiple other crimes that victimized others. And when caught, both defendants tried to obstruct the instant proceedings. An extremely long prison sentence is required to deter others who may consider committing similar crimes. It is also necessary to promote respect for the law.

E.    Restitution

The government continues to confer with the victims in this case regarding whether those victims wish to seek restitution. The government respectfully requests that any restitution order be entered within 90 days after sentencing as is permitted by law. PSR ¶ 169.

40

X.      Conclusion

For the reasons set forth above, the government respectfully requests that the

Court sentence Elder to a Guidelines sentence of life in prison and Bryant to no less than 40

years in prison.

Dated:     Brooklyn, New York
           February 2, 2023

                                        Respectfully submitted,


                                        BREON PEACE
                                        UNITED STATES ATTORNEY
                                        Eastern District of New York
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201


                             By:    _____/s/_____
                                        Anna L. Karamigios
                                        Genny Ngai
                                        Assistant United States Attorneys
                                        (718) 254-7000

41

# EXHIBIT A

FD-302 (Rev. 5-8-10)



OFFICIAL RECORD

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry     01/08/2019

NOAH MOLINA, TAX ID 930753, Emergency Service Unit Truck 7 was interviewed at the corner of Nostrand Avenue and Maple Avenue in Brooklyn, New York. After being advised of the identity of the interviewing Agent and the nature of the interview, MOLINA provided the following information:

On 01/04/2018, MOLINA and his unit received word that a FBI Agent involved in shots fired call and that the UNSUB was now barricaded within the apartment.

MOLINA and Truck #7 were in the vicinity of 292 Maple Street Brooklyn, New York preparing for an NYPD Arrest Warrant unrelated to the FBI operation at 292 Maple Street, Brooklyn, New York. MOLINA and his team arrived on the scene and when they went to the 3rd floor of 292 Maple Avenue, they saw that the FBI were still on scene holding the door. FBI then turned the scene over to NYPD ESU. NYPD ESU positioned themselves at the door and attempted multiple call outs to the UNSUB, now identified as WILBERT BRYANT. MOLINA was in the first stack and was carrying the shield and Detective KEITH ARCE was next to him and they were closest to the door.

NYPD ESU attempted to conduct numerous call outs for BRYANT with no response. They then threw in a camera in order to visually clear the area in front of them. Afterwards, NYPD ESU employed a K-9 police dog into the apartment and determined that BRYANT had retreated into the bedroom with the door closed. ESU members then entered the apartment and physically cleared the apartment minus the bedroom. ARCE and MOLINA again took up positions closest to the bedroom door.

As they are by the door, ARCE attempts the handle to the bedroom door and they tell BRYANT to "come out with hands up and no one gets hurt." NYPD ESU begins to place ballistic blankets on the walls surrounding the door. MOLINA still has the shield.

NYPD ESU tells BRYANT that they will deploy the K-9 police dog and BRYANT states " If the dog comes in he will get it."

**GOVERNMENT EXHIBIT**

**3500-NM-02(a)**

**18-CR-92 (WFK)**

Investigation on  01/04/2019  at  Brooklyn, New York, United States (In Person)

File #  ▮▮▮▮▮▮▮▮▮                                                    Date drafted  01/07/2019

by  CHARRIEZ JOSE N

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

███████████████

Continuation of FD-302 of  (U)  Interview of NOAH MOLINA (ESU)                    , On  01/04/2019  , Page  2 of 2

NYPD ESU repeats that they don't want anyone or you (BRYANT) to get hurt.  BRYANT states "You gonna have to hurt me."

As MOLINA and ARCE push the door open, MOLINA is able to see that BRYANT is hiding behind mattresses.  MOLINA is up front with the shield and views BRYANT come out from behind and charge them with a knife in his hand and NYPD ESU falls back and closes the door.

NYPD ESU instructs commands to drop the knife and come out with hands up.  During this time, a hole was opened up on a side wall in order to see inside the bedroom where BRYANT was located.  Through this wall, NYPD ESU tased BRYANT.

NYPD ESU enter the bedroom door and MOLINA moves past BRYANT who is lying on the floor because he still was holding the shield.  MOLINA noticed that BRYANT's hands were under his body and as the NYPD ESU team attempted to place him under arrest BRYANT was resisting arrest.  When NYPD ESU was able to finally place him in restraints and roll him over, MOLINA viewed a knife was hidden under him where his hands were.

# EXHIBITS B-I















# EXHIBIT J
# FILED UNDER SEAL