UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
UNITED STATES OF AMERICA,                      :
                                               :
                v.                             :        **MEMORANDUM & ORDER**
                                               :        18-CR-00092 (WFK)
Ppassim Elder,                                 :
                                               :
                        Defendant.             :
-----------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge:**

On March 12, 2020, the United States of America filed a fourteen-count Superseding Indictment (the "Indictment") in this action. *See* ECF No. 230. Beginning on September 20, 2021, this Court presided over the jury trial of Ppassim Elder ("Defendant") and Wilbert Bryant ("co-Defendant"). On October 1, 2021, the jury found Ppassim Elder guilty at to Counts One through Thirteen, and Wilbert Bryant guilty as to Counts Two, Seven, Eight, Nine, and Ten. The jury acquitted Defendant Elder on Count Fourteen. On November 9, 2022, this Court vacated the convictions for Counts Nine and Ten as to Defendants Elder and Bryant. For the reasons discussed below, Defendant is hereby sentenced to a term of life incarceration, restitution in an amount to be determined, forfeiture in the amount of $330,561.36, and a $1,100 mandatory special assessment.

## I.    Charges and Conviction

On October 1, 2021, Defendants Ppassim Elder and Wilbert Bryant were convicted by a jury, which found beyond a reasonable doubt these two defendants guilty of (1) committing physical violence in furtherance of extortion and extortion conspiracy against Mahmoud and Hani Kasem, in violation of 18 U.S.C. § 1951(a) (Counts Seven and Eight); (2) using, brandishing, discharging and causing the death of Hani Kasem through the use of a firearm, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i)–(iii) and 924(j)(1) (Counts Nine and Ten); and (3) conspiring to commit bank fraud, in violation of 18 U.S.C. § 1349 (Count Two). The jury also found Elder guilty of bank fraud conspiracy, in violation of 18 U.S.C. § 1349 (Counts One, Three, and Five); committing physical violence in furtherance of an extortion against Mohammed and Ibrahim Rabah, in violation of 18 U.S.C. § 1951(a) (Count Four); access device fraud, in violation of 18 U.S.C. §§

1

1029(a)(1) and 1029(c)(1)(A)(i) (Count Six); conspiring to make false statements and making false statements, in violation of 18 U.S.C. §§ 371 and 100(a)(2) (Counts Eleven and Twelve); and aggravated identity theft, in violation of 18 U.S.C. § 1028a (Count Thirteen). The jury acquitted Elder on the charge of obstruction of justice (Count Fourteen).

On May 20, 2021, Elder filed a pretrial motion requesting, among other things, dismissal of Counts Nine and Ten of the Indictment, based on the crime charged in Count Eight. ECF No. 275. Specifically, Count Eight charges Defendant Elder and co-Defendant Bryant with knowingly and intentionally threatening to commit and committing physical violence against Mahmoud and Hani Kasem in furtherance of a plan to commit extortion, in violation of 18 U.S.C. § 1951(a). Counts Nine and Ten of the Superseding Indictment relate to the same conduct giving rise to Count Eight. Specifically, Count Nine charged co-Defendants Elder and Bryant with knowingly and intentionally using and carrying a firearm during and in relation to a crime of violence and possessing, brandishing, and discharging that firearm in furtherance of the crime, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i)-(iii), and Count Ten charged Defendants with committing murder during that crime of violence in violation of 18 U.S.C. § 924(i)(l).

On August 25, 2021, the Court denied the motion at ECF No. 275. *See* ECF No. 316. However, on October 2, 2022, and October 12, 2022, Defendant Elder and co-Defendant Bryant filed motions for reconsideration of the Court's decision denying the motion. ECF Nos. 420, 424. On November 9, 2022, in light of the United States Supreme Court's decision in *United States v. Taylor*, 142 S. Ct. 2015 (2022) and the Second Circuit's decision in *United States v. Chappelle*, 41 F.4th 102 (2d Cir. 2022), and on consent of the parties—including the United States through the office of the U.S. Attorney—this Court granted the Defendants' motions and vacated co-Defendants Elder and Bryant's convictions as to Counts Nine and Ten. ECF. No. 435.

2

This Court hereby sentences Defendant and sets forth its reasons for Defendant's sentence using the rubric of the 18 U.S.C. § 3553(a) factors pursuant to 18 U.S.C. § 3553(c)(2).

## II.    Discussion

### a.  Background

The Federal Bureau of Investigation ("FBI") led the investigation into the instant offenses. The FBI's investigation revealed the assorted criminal conduct of Defendant Ppassim Elder, which included fraud and extortion schemes, as well as various acts of intimidation and violence.

### i. *Fraud Schemes*

Since at least 2012, Defendant had recruited individuals to commit various acts of bank fraud. These individuals, including Defendant's co-Defendants and others, had—at the Defendant's direction—opened bank accounts in their names and gave account information to Defendant for his personal use. Presentence Investigation Report ("PSR") at ¶¶ 17-24, ECF No. 429. These accounts were then used to commit various frauds totaling a loss amount of $387,660.35. *Id.* at ¶ 24.

The fraudulent schemes proceeded as follows: Elder and his co-conspirator criminals convinced individuals from across this great nation to deposit money into newly opened accounts listed in Defendant's co-conspirators' names. *Id.* at ¶ 18. These persons deposited these funds in exchange for goods or services promised but never provided. *Id.* at ¶ 18. The co-conspirator named on the account then withdrew the deposited funds in cash and delivered them to Defendant. *Id.* at ¶ 18. Defendant, in turn, distributed a small percentage of his money to his co-conspirator as payment. *Id.* at ¶ 18.

3

From approximately May 2012 to November 2015, Defendant Zarieh opened accounts under his own name at JP Morgan Chase, Bank of America, and People's United Bank for Elder's use. *Id.* at ¶ 19. Between October 2014 and February 2015, Defendant Abdu opened numerous accounts in his own name, including at Bank of America, Citibank, and JP Morgan Chase, for Elder's use. *Id.* at ¶ 19. These defendants used these accounts to commit numerous frauds, totaling in a loss amount of $61,700. *Id.* at ¶ 19.

Between July 2012 and August 2012, Bryant opened an account at TD Bank in his name for Defendant's use. *Id.* at ¶ 20. Bryant used this account to commit fraud against one individual, totaling an additional loss amount of $32,000. *Id.* at ¶ 20.

In approximately December 2015, Defendant Mohammed Rabah opened an account at TD Bank in his name for Defendant's use. *Id.* at ¶ 21. Rabah used this account to commit fraud against one individual, totaling a loss amount of $31,700. *Id.* at ¶ 21. Defendant Rabah convinced this individual to deposit funds in exchange for a classic car, which, of course, was never delivered. *Id.* at ¶ 21.

Between approximately September 2016 and May 2017, Defendant Mahdi Abdel-Rahim opened accounts in the name of a company called Sajahtera, Inc., of which Abdel-Rahim was the owner of record, for Defendant's use. *Id.* at ¶ 22. This account was used to commit fraud against one individual, totaling in a loss amount of $212,386.35. *Id.* at ¶ 22. More specifically, in November 2016, this individual deposited this amount into one of the Sajahtera accounts, believing he was purchasing two real estate properties in Statesboro, Georgia. *Id.* at ¶ 11. Abdel-Rahim then withdrew large amounts of this money and distributed it to Defendant at the direction of the Defendant. *Id.* at ¶ 22.

4

Justin Woods, an acquaintance of Ahmad Zahrieh, opened an account at TD Bank in his name for Defendant's use in 2013. *Id.* at ¶ 23. This account was used to commit fraud against two individuals, totaling in a loss amount of $49,874. *Id.* at ¶ 23.

### ii. Extortion of Mohammed Rabah and Ibrahim Rabah

Elder's extortion of Mohammed Rabah and Ibrahim Rabah originated in January 2016, after Mohammed Rabah stole approximately $25,000 from the proceeds of a bank fraud he committed with the Defendant. *Id.* at ¶ 25. As part of Elder's scheme to defraud, on January 24, 2016, an individual deposited $31,700 into Mohammed Rabah's account believing he was purchasing a classic car. *Id.* at ¶ 25. Rabah, together with another individual, then withdrew $25,000 of these funds for their personal use without prior informing Defendant or gaining Defendant's permission. *Id.* at ¶ 25. Defendant subsequently confronted Rabah, and when Rabah refused to return these funds, Defendant, together with others, went to Rabah's house to collect these funds. *Id.* at ¶ 26.

Rabah was not home when Defendant and his accomplices arrived, but Rabah's brother, Ibrahim Rabah, was, and he answered the door to find Elder. *Id.* at ¶ 26. When Ibrahim Rabah told Defendant that Mohammed Rabah was not home, Defendant responded that he wanted to "leave a message" for Mohammed Rabah and then proceeded to punch Ibrahim Rabah in the nose. *Id.* at ¶ 26. Defendant then continued to assault Ibrahim Rabah by punching him in the body and attempting to drag Ibrahim Rabah from his home. *Id.* at ¶ 26. Later that evening, Defendant, his wife Fatimah Najjar—a cousin of Ibrahim Rabah's wife—and their baby daughter, returned to the Rabah home to discuss the incident. *Id.* at ¶ 27. Defendant and his wife requested the police not be notified. *Id.* at ¶ 27.

5

Defendant continued to demand payment of the money Mohammed Rabah allegedly stole and repeatedly called the store where Ibrahim Rabah to intimidate him. *Id.* at ¶ 27. Eventually, the Rabah family paid Elder. *Id.* at ¶ 27.

### iii. *Extortion of Mahmoud Kasem and Hani Kasem*

Mahmoud Kasem ran a business with his father, Hani Kasem, called Garden Valley Distributors, which supplied local delis and bodegas. *Id.* at ¶ 28. In the fall of 2016, Mahmoud Kasem wanted to expand the business but was unable to secure funding from his bank. *Id.* at ¶ 28. Defendant approached Mahmoud Kasem and offered to meet him at the Garden Valley store in Ozone Park. *Id.* at ¶ 28. Over the course of subsequent meetings, Defendant offered to invest in Garden Valley. Mahmoud Kasem accepted Defendant's offer. *Id.* at ¶ 29. Defendant then requested Mahmoud Kasem take checks from Defendant and cash them into Garden Valley's account. *Id.* at ¶ 29. Defendant instructed Mahmoud Kasem he would thereafter ask him to withdraw the money from the account in cash and return it to him. *Id.* at ¶ 29.

Mahmoud Kasem deposited two checks into the Garden Valley account. *Id.* at ¶ 30. These checks were issued by Sajahtera Inc., funded by Defendant's fraudulent schemes, and totaled $85,000. *Id.* at ¶ 30. After Mahmoud Kasem deposited these checks, Defendant did as he promised and, at various times, directed Mahmoud Kasem to withdraw the cash and give it to him. *Id.* at ¶ 30.

In February 2017, Defendant asked Mahmoud Kasem to let him use the Garden Valley account to send a wire transfer, and Mahmoud Kasem agreed. *Id.* at ¶ 31. Defendant brought $100,000 in cash to the Garden Valley store, and he and Mahmoud Kasem went to the local TD Bank. *Id.* at ¶ 31. After arriving at the bank, Mahmoud Kasem returned home to retrieve another

6

form of identification. By the time Mahmoud Kasem came returned to the bank, the cash had been deposited into the Garden Valley account and sent via wire transfer to another company at Defendant's direction. *Id.* at ¶ 31.

In approximately March 2017, Defendant asked Mahmoud Kasem to again deposit cash into the Garden Valley account and wire it for Defendant. *Id.* at ¶ 32. This time the amount to be deposited was $150,000. *Id.* at ¶ 32. Mahmoud refused because he had become suspicious of Defendant's transactions. *Id.* at ¶ 32. Mahmoud Kasem's accountant also indicated continued deposits such as this could cause trouble with the Internal Revenue Service ("IRS"). *Id.* at ¶ 32.

Subsequently, Mahmoud Kasem asked Defendant to sign a document stating the cash and checks deposited into the Garden Valley account were Defendant's. *Id.* at ¶ 33. Defendant refused. *Id.* at ¶ 33. Instead, Defendant demanded Mahmoud Kasem repay the amount of money remaining in the Garden Valley account from the deposited checks, which approximated $40,000. *Id.* at ¶ 33. Mahmoud Kasem could not repay this money at once but offered to make payments in smaller increments. *Id.* at ¶ 33. Defendant refused this proposition and demanded an immediate return of the funds in one lump sum. *Id.* at ¶ 33.

Defendant proceeded to threaten Mahmoud Kasem with physical violence to induce this repayment. *Id.* at ¶ 34. Defendant threatened to shoot Mahmoud Kasem in the leg and to send "blacks" and "Hispanics" after him, as if they were dogs. *Id.* at ¶ 34. He also hired individuals to throw rocks at the Kasem family home. *Id.* at ¶ 34. In April 2017, these individuals drove to the Kasem family home, and when Mahmoud Kasem saw one of these men with a rock in his hand, he proceeded to chase him. *Id.* at ¶ 34. This individual later told Mahmoud Kasem Defendant hired him to throw rocks and physically assault Mahmoud Kasem, which the individual ultimately did not do. *Id.* at ¶ 34.

7

On another occasion, using a large rock, an individual shattered the windshield of one of Mahmoud Kasem's cousin's vehicles, which was parked in the Kasems' driveway. *Id.* at ¶ 35.

On yet another occasion, Defendant and a different individual went to the Kasem home, unannounced and without permission, and began yelling for Mahmoud Kasem, who was not home. *Id.* at ¶ 36. However, Mahmoud Kasem's father, Hani Kasem, was home and eventually came downstairs to speak with the Defendant and his accomplice. *Id.* at ¶ 36. Thereafter, while attending a wedding in October 2017 at which Hani Kasem and his wife Fozieh were present, Defendant proceeded to threaten Hani Kasem, stating, "I'm going to do my job now." *Id.* at ¶ 37.

### iv.  *Murder of Hani Kasem*

In July 2017, Defendant recruited co-Defendants Frederick McCoy and Wilbert Bryant to extort the Kasems. *Id.* at ¶ 38. Defendant met co-Defendant McCoy in 2011 when they were incarcerated together on Rikers Island. *Id.* at ¶ 38. McCoy met Bryant in 1992, when they participated in a drug treatment program together following their respective releases from prison. *Id.* at ¶ 38. Defendant met co-Defendant Bryant through McCoy, who introduced the two for the purpose of committing bank fraud. *Id.* at ¶ 38.

With respect to the Kasems, Defendant offered co-Defendants McCoy and Bryant $10,000 to help him collect the money he claimed Mahmoud Kasem owed him. *Id.* at ¶ 39. Defendant directed co-Defendants McCoy and Bryant to threaten Mahmoud Kasem and recommended they bring a gun for intimidation purposes when doing so. *Id.* at ¶ 39.

Neither McCoy nor Bryant possessed or had access to a gun at the time of Defendant's extortion scheme. *Id.* at ¶ 40. So, in the weeks before the murder on October 23, 2017, co-

8

Defendants McCoy and Bryant recruited co-Defendant Dwayne Ling. Ling subsequently obtained a firearm on the group's behalf. *Id.* at ¶ 40.

In furtherance of the Kasem extortion, Defendant provided co-Defendants McCoy and Bryant with the address of Mahmoud Kasem's Garden Valley business. *Id.* at ¶ 41. Co-Defendants McCoy and Bryant proceeded to surveil the store and Mahmoud Kasem on several occasions. *Id.* at ¶ 41. On October 23, 2017, co-Defendants McCoy, Bryant, and Ling drove to Garden Valley. They found Mahmoud Kasem, Hani Kasem, and two other workers, Rolando Mojica and Anjane Ramnath and confronted them. *Id.* at ¶ 42.

Once inside the store, McCoy approached Mahmoud Kasem and informed him they were there to collect Defendant's money, and co-Defendant Bryant reiterated this same purpose. *Id.* at ¶ 42. After Mahmoud Kasem stated the matter did not concern them, co-Defendant McCoy took the firearm from Ling, who was holding it at his side, and pistol-whipped Mahmoud Kasem above his left eye, causing Mahmoud Kasem to start bleeding. *Id.* at ¶ 42. At the same time, Bryant directed Ramnath not to touch her phone. *Id.* at ¶ 42. When Mojica attempted to run out of the store, Bryant, who was standing by the door, tried to stop him. *Id.* at ¶ 42.

Mahmoud Kasem and co-Defendant McCoy then struggled for the gun and the magazine, which had been ejected from the pistol. *Id.* at ¶ 43. Co-Defendant Ling later picked up the gun and pointed it at Mahmoud Kasem. *Id.* at ¶ 43. At this point, co-Defendant McCoy had left the store and proceeded to walk back toward the co-Defendants' vehicle. *Id.* at ¶ 43. Co-Defendants Ling and Bryant were still in the store fighting with Hani Kasem, who was attempting to prevent them from exiting. *Id.* at ¶ 43. Ling then took the gun with the bullet in the chamber and fired it into the face of Hani Kasem, killing him. *Id.* at ¶ 43.

9

When co-Defendants McCoy, Bryant, and Ling returned to the car Ling stated he did not mean to shoot anybody. *Id.* at ¶ 43.

In the days thereafter, McCoy and Ling traveled to Scranton, Pennsylvania in an attempt to avoid detection and apprehension by law enforcement. *Id.* at ¶ 44. Co-Defendant McCoy also destroyed his cell phone and purchased fake identification in the event he was stopped by police. *Id.* at ¶ 44. Bryant went as far as Virginia. *Id.* at ¶ 44.

In March 2018, a warrant was issued for co-Defendant McCoy's arrest. *Id.* at ¶ 44. Co-Defendant McCoy again fled to Scranton, Pennsylvania before returning to the Eastern District of New York a few days later to turn himself in. *Id.* at ¶ 44. Notably, he destroyed his fake identification prior to returning. *Id.* at ¶ 44.

v. *False Statements and Aggravated Identity Theft*

Elder was arrested on March 5, 2018. Between March 2018 and June 2018, Defendant was represented by Arthur Aidala, Esq., distinguished defense counsel here in Brooklyn. *Id.* at ¶ 56. While incarcerated at the Metropolitan Detention Complex ("MDC"), Defendant had a relative open a cell phone account for a number listed in the name "Author Aidala." *Id.* at ¶ 56. Elder then placed this phone number on his phone list at the MDC and falsely indicated it belonged to his attorney. *Id.* at ¶ 56. That was a lie. Between March 2018 and May 2018, Defendant, from inside the MDC, and his relative, using the number in Mr. Aidala's name, then spoke with each other about, among other things, the fact Defendant was an "under the table" owner of a cryptocurrency business. *Id.* at ¶ 56. At no point did Mr. Aidala authorize Defendant to use his information in this manner. *Id.* at ¶ 56. In fact, Mr. Aidala came to this Court and testified—pursuant to a subpoena—to that fact.

10

### vi. *Other Misconduct*

In addition to the offenses charged in this instance, between 2012 and 2017, Defendant engaged in a series of additional known extortions, *id.* at ¶¶ 45-47, frauds, *id.* at ¶¶ 48-49, and other criminal activities, *id.* at ¶ 50.

### b. Legal Standard

18 U.S.C. § 3553 outlines the procedures for imposing a sentence in a criminal case. A sentencing court must also consider the Sentencing Guidelines in addition to the seven factors listed in 18 U.S.C. § 3553(a) when making a sentencing decision, which the Court has done. While the Sentencing Guidelines are merely advisory. *United States v. Booker,* 543 U.S. 220, 264 (2005). *See also United States v. Kimbrough,* 552 U.S. 85 (2007). The Guidelines range is the "starting point and the initial benchmark" for a court evaluating a criminal sentence. *Gall v. United States,* 552 U.S. 38, 49 (2007). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Id* at 49. In this regard, the Guidelines provide "the framework for sentencing" and "anchor… the district court's discretion." *Molina-Martinez v. United States,* 136 S. Ct. 1338, 1346 (2016) (internal reference and quotation marks omitted).

If and when a district court imposes a sentence outside of the Sentencing Guidelines range, the court "shall state in open court the reasons for its imposition of the particular sentence, and …the specific reason for the imposition of a sentence different from that described" in the Guidelines. 18 U.S.C. § 3553(c)(2). The court must also "state[] with specificity" its reasons for so departing or varying "in a statement of reasons form." *Id.* "The sentencing court's written statement of reasons shall be a simple, fact-specific statement explaining why the guidelines range

11

did not account for a specific factor or factors under § 3553(a)." *United States v. Davis*, 08-CR-0332, 2010 WL 1221709, at \*1 (E.D.N.Y. Mar. 29, 2010) (Weinstein, J.).

This Court has considered the applicable Guidelines range as well as the seven factors listed in Section 3553(a). *United States v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005). It will address each in turn.

## III. Analysis

### a. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

#### i. Family and Personal Background

Defendant was raised in a loving home, with a "great family," under middle-income circumstances. PSR at ¶¶ 143, 145. He had a good childhood, devoid of any abuse or significant financial struggles. *Id.* at ¶ 145

His father is now deceased, but his mother is still alive and currently resides in Ohio. *Id.* at ¶ 132. Defendant has seven siblings, and two paternal half siblings. *Id.* at ¶ 133. He has a close relationship with all. *Id.* at ¶ 133.

Defendant married his wife, Fatima Najjar, in 2013, and the couple share two young children together. *Id.* at ¶ 136. The couple has since separated due to Defendant's instant legal situation. However, Defendant and Ms. Najjar remain amicable. *Id.* at ¶ 136.

#### ii. Educational and Employment History

Defendant earned a high school diploma after attending Art and Design High School in Manhattan from 1993 to 1997. *Id.* at ¶ 143. Defendant then attended Touro University in

12

Manhattan for two years. *Id.* at ¶ 143. He later left the University in 1999 to focus on his job working as merchant account broker. *Id.* at ¶ 143.

Defendant worked as a merchant account broker from 1999 to 2004. *Id.* at ¶ 146. He was unemployed between 2004 and 2008. *Id.* at ¶ 146. In 2008, Defendant began reselling refurbished cellphones and sneakers. *Id.* at ¶ 146. He worked in this capacity until 2018, earning roughly $50,000 per year. *Id.* at ¶ 146. He also was the part-owner of Myst Lounge, a hookah lounge in Staten Island, during this period. In 2015, he ultimately sold his shares in the lounge for $20,000. *Id.* at ¶ 146.

In 2015, Defendant also began trading in digital currencies, reportedly earning between $3,000 and $7,000 per month (gross). *Id.* at ¶ 145. Despite earning a salary during his periods of employment, Elder never filed personal income tax returns, neither with the IRS nor with New York State Department of Taxation and Finance, as he was legally required to do. *Id.* at ¶ 147.

Defendant has been unemployed since 2018 when his incarceration for the instant offense began. *Id.* at ¶ 144.

### iii.  Prior Convictions

Defendant has spent his adult life enmeshed in the criminal justice system. *Id.* at ¶¶ 119-125. Elder was arrested for the first time on March 1, 2000, when he was charged and subsequently convicted of Grand Larceny in the 4th Degree, a Class D Felony, for purchasing merchandise with a fraudulently obtained credit card. *Id.* at ¶ 119. On November 22, 2002, Defendant was arrested again. *Id.* at ¶ 120. On this occasion, Defendant was charged and subsequently convicted of Not Licensed with Division of Taxation, a Class 4 Felony, and Failing to File Income Tax, a Class 3 Felony. *Id.* at ¶ 120. On May 17, 2004, Elder was arrested and subsequently convicted yet again.

13

*Id.* at ¶ 121. This time for Criminal Possession of Stolen Property in the Third Degree, a Class D Felony, after he was found in possession of 10 fraudulent credit cards. *Id.* at ¶ 121.

Despite serving a term of incarceration for this offense, Defendant continued to engage in crimes. On May 28, 2004, Defendant was arrested and subsequently convicted of Criminal Possession of Stolen Property in the Fourth Degree, a Class E Felony, after he was found in possession of a stolen credit card. *Id.* at ¶ 122. A year later, Defendant was arrested yet again. This time, Defendant was charged for ramming his vehicle into another's six times while the owner of the vehicle was in the car. *Id.* at ¶ 123. Despite fleeing the scene, Defendant was eventually arrested and subsequently convicted of Criminal Mischief, a Class A Misdemeanor. *Id.* at ¶ 123.

Officers from the New York City Police Department ("NYPD") also arrested Defendant on May 4, 2005, for violating a court order of protection. *Id.* at ¶ 124. On this charge, Elder was subsequently convicted of Reckless Endangerment in the Second Degree, a Class A Misdemeanor. *Id.* at ¶ 124. Defendant was arrested on March 20, 2011 and was charged and subsequently convicted of Assault in the Third Degree, a Class A Misdemeanor, for grabbing, beating, and stomping on his neighbor before eventually throwing his victim down two flights of stairs and threatening him with death. *Id.* at ¶ 125.

### iv. *Medical and Mental Health*

Defendant is healthy with no reported history of serious medical conditions other than panic attacks reported while serving his instant incarceration. *Id.* at 140. He largely attributes these attacks to his separation from his family. *Id.* at 141. He is presently prescribed medication to help treat these attacks. *Id.* at 141. Beyond this, Defendant does not receive treatment for any other ailments, either mental or physical.

14

### v. *Substance Abuse*

Defendant has no reported history of substance use. *Id.* at ¶ 142.

### vi. *Nature and Circumstances of the Offense*

The Court's previous statements make clear the nature and circumstances surrounding the instant offense. *See supra* at Sections II(a)(i)-(vi).

### b. The Need for the Sentence Imposed

The second § 3553(a) factor instructs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

The Defense urges the Court to depart from the recommended guidelines range and to impose a non-guidelines sentence below 20 years. This is to the extent it finds a sentence any lengthier would be greater than necessary to achieve the goals of Section 3553. *See* Defense Sentencing Memorandum ("Def. Memo") at 13, 16, 23, ECF No. 453. The Defense raises the following in support of this position: first, the Defense claims a lengthy sentence for this Defendant would do little to advance the statutory goals of deterrence, be that general or specific. *Id.* at 13 (referencing 18 U.S.C. § 3553(a)(2(B)). The Defense claims a sentence beyond 20 years would be greater than necessary to deter Defendant from engaging in unlawful conduct following his

15

term of incarceration. *Id.* at 14. The Defense suggests the Court should doubt the concept of general deterrence altogether. *Id.* at 14 ((citing academic and statistical analyses that cast doubt as to whether lengthy sentences reduce crime through deterrence) (referencing Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006); Andrew von Hirsch, et. al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999); Gary Kleck, et al., *The Missing Link in General Deterrence Theory*, 43 Criminology 623 (2005))). *See also id.* at 15 (citing the Honorable Judge Jack B. Weinstein's opinion in *United States v. Bannister*, 786 F. Supp. 617 (E.D.N.Y. 2011) (Weinstein, J.) (advancing the proposition that "specific deterrence is not accomplished by lengthy incarceration…in actuality, unnecessary and excessive prison sentences aimed at specific deterrence are likely to promote high rates of recidivism.")).

The Defense argues Defendant's personal history and characteristics militate in favor of the Court imposing a sentence below 20 years. *Id.* at 19. The Defense claims Defendant is a devoted family man, with numerous loved ones willing to advocate on his behalf. *Id.* at 19. The Defense produced letters from Defendant's relatives to this effect, including notes from his brother, Hallum Alan Abdelhack, his sister, Anwaar Dolah, his sister-in-law, Fatin Elder, his nephew, Nadeen A. Abdelhack, his niece, Nawal A. Abdelhack, in addition to letters from his cousins and two other unspecified relatives. *See* Exhibit One to Defendant's Sentencing Memorandum ("Def. Memo Exhibit One"), at 1-9, ECF No. 453-1; Defendant's Supplemental Sentencing Letter Exhibits A and B, ECF. No. 476-1. Each of these letters describes Defendant as a crucial family member with a decent character. *Id.* Defendant's relatives also ask this Court to show compassion at his sentencing. *Id.*

16

The Defense reiterates this point in its Sentencing Memorandum and argues the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005) and the Second Circuit's decision in *United States v. Crosby*, 397 F. 3d. 103 (2d Cir. 2005) make room for sentencing courts to show compassion by rendering the Sentencing Guidelines advisory. *Id.* at 21-23. *See also id.* at 23 (referencing *United States v. Kloda*, 133 F. Supp. 2d 345, 349 (S.D.N.Y. 2001) (Hellerstein, J.) for the proposition that "the Guidelines may be tempered by compassion.") (internal quotation marks omitted)).

Lastly, the Defense urges this Court to consider the "horrible conditions" at MDC, where Defendant has been incarcerated since his arrest in 2018, claiming "harsh prison conditions are a factor to be considered in arriving at a just sentence under [Section] 3553(a)." *Id.* at 23-24 (citing *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001)).

This Court considers all the statements contained in Defendant's Memorandum. Yet, the nature of this offense and this Defendant's personal characteristics stand in stark contrast to the words his relatives offer on his behalf.

Defendant's extensive criminal history presents a gravely disturbing reality. This Defendant began his life of crime when he was 20 years old, and this Court has seen no indication he will abandon that life.

Defendant has been incarcerated many times before, serving terms of imprisonment ranging between 18 months and 3 years. Yet, without fail, he has continued to harm, defraud, and now murder members of the public upon his release whenever he gets the chance. Even while incarcerated, this Defendant has shown little or no regard for rules or authority figures. He has numerous reported infractions, for refusing to obey orders, for disrupting and abusing privileges, and more. PSR at ¶ 138.

17

Indeed, with respect to the instant offense, Defendant's conduct is particularly egregious. He was the leader of an elaborate fraudulent conspiracy. He recruited a number of individuals to advance his schemes and defraud his victims. He has even acted violently towards his co-conspirators at times when they failed to give Defendant what he believed he was owed from their criminal enterprise. He encouraged and recruited his co-conspirators to procure weapons and to otherwise engage in violence on behalf of the conspiracy—from rocks to guns—and he often boasted and bragged to others about these misdeeds.

This Defendant defrauded his victims out of hundreds of thousands of dollars all across this country. His conduct was motivated by greed and greed alone, and his repeated acts of violence suggest he has little to no regard for the lives of others. As far as remorse goes, he has shown none.

This Court's sentence reflects the seriousness of the instant offense. It strives to promote respect for the law; and it aims to achieve just punishment for the crimes of conviction. Not only that, this Court's sentence strives to deter this Defendant from continuing to wreak havoc on his community—indeed the entire community of the Eastern District of New York—and to protect the public at large. In sentencing the Defendant, this Court also hopes to provide him with the training and treatment he needs to change his life's course.

### c.  The Kinds of Sentences Available

The third § 3553(a) factor requires the Court to detail "the kinds of sentences available" for Defendant. 18 U.S.C. § 3553(a)(3).

On Counts One, Two, Three, and Five, the maximum term of imprisonment is 30 years on each count. 18 U.S.C. § 1344. On Count Four, the maximum term of imprisonment is 20 years.

18

18 U.S.C. § 1951(a). On Count Six, the maximum term of imprisonment is 10 years. 18 U.S.C. § 1029(a)(1) and 18 U.S.C. § 1029(c)(1)(A)(i). On Counts Seven and Eight, the maximum term of imprisonment is 20 years on each count. 18 U.S.C. § 1951(a). On Counts Eleven and Twelve, the maximum term of imprisonment is five years. 18 U.S.C. § 371 and 18 U.S.C. § 1001(a)(2). On Count Thirteen, the mandatory term of imprisonment is two years. 18 U.S.C. § 1028A(a)(1), and the term of imprisonment for Count Thirteen must be imposed consecutively to any other counts. 18 U.S.C. § 1028A(a)(1).

On Counts One, Two, Three, and Five, the Court may impose a term of supervised release of not more than five years on each count. 18 U.S.C. § 3583(b)(1). On Counts Four, Six, Seven, Eight, Eleven, and Twelve, the Court may impose a term of supervised release of not more than three years on each count. 18 U.S.C. § 3583(b)(2). On Count Thirteen, the Court may impose a term of supervised release of not more than one year. 18 U.S.C. § 3583(b)(3). Multiple terms of supervised release shall run concurrently. 18 U.S.C. § 3624(e).

On Counts One, Two, Three, and Five, which are Class B Felonies, Defendant is ineligible for probation, and he will be sentenced at the same time to a term of imprisonment for the same or a different offense. 18 U.S.C. § 3561(a)(1) and (3). On Counts Four, Six, Seven, Eight, Eleven, and Twelve, Defendant is ineligible for probation because he will be sentenced at the same time to a term of imprisonment for the same or a different offense. 18 U.S.C. § 3561(a)(3). On Count Thirteen, Defendant is ineligible for probation because it is expressly precluded by statute. *See* 18 U.S.C. § 1028A(b)(1).

On Counts One, Two, Three, and Five, the maximum fine is $1,000,000 on each count. 18 U.S.C. § 3571(b). On Counts Four, Six, Seven, Eight, Eleven, Twelve, and Thirteen, the maximum fine is $250,000 on each count. 18 U.S.C. § 3571(b). There is a $100 mandatory special

19

assessment on each Count, totaling in $1,100. 18 U.S.C. § 3013. In determining whether to impose a fine, and the amount of such fine, this Court considers, among other factors, the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed. 18 U.S.C. § 3572(a)(6). *See also* USSG §5E1.2(d)(7).

As detailed in the Indictment, the Government may seek forfeiture in accordance with 18 §§ U.S.C. 982(a)(2), 982(b)(1), 981(a)(1)(C), 982(a)(2)(B), 982(b)(1), 1029(c)(1)(C), 1029(c)(2), 924(d)(1), 28 U.S.C. § 2461(c), and 21 U.S.C. § 853(p). *See* Indictment at ¶¶ 16-21.

Pursuant to 18 U.S.C. § 3663A, restitution is mandatory. However, the amount of restitution is not determinable yet as the Court is still awaiting responses from Defendant's victims and his victims' families. PSR at ¶ 169. The Court reserves its right pursuant to 18 U.S.C. § 3664(d)(5) to hold an evidentiary hearing within 90 days after this sentencing to determine the specific amounts owed to Defendant's victims.

### d. The Kinds of Sentence and the Sentencing Range Established for Defendant's Offenses

The fourth § 3553(a) factor requires the Court to discuss "the kinds of sentence and the sentencing range established for…the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[.]" 18 U.S.C. § 3553(a)(4)(A).

### i. Probation's Guidelines Calculation

Probation calculates Defendant has a total combined adjusted offense level of 43, PSR at ¶ 117, and a total criminal history score of 14, *id.* at ¶126, resulting in a criminal history category of VI, *id.* at ¶ 127. Probation calculates this based on the following:

20

1. Total Adjusted Offense Level

a. Counts One, Two, Three, Five, and Six

Counts One, Two, Three, and Five, which all charge Conspiracy to Commit Bank Fraud, and Count Six, which charges Access Device Fraud, are grouped pursuant to USSG §3D1.2(d) as the Guidelines calculation for these charges is largely based on the total loss. *Id.* at ¶ 59.

Pursuant to USSG §3D1.3(b), since Counts One, Two, Three, Five, and Six involve offenses of the same general type to which different guidelines apply, the offense guideline that produces the highest offense level is applied. *Id.* at ¶ 59. In this case, that is USSG §2B1.1. *Id.* at ¶ 59. Accordingly, the applicable guideline for these grouped offenses is USSG §2B1.1. *Id.* at ¶ 59.

For Counts One, Two, Three, Five, and Six, the base offense level is 7, per USSG §2B1.1(a)(1), since the offenses are referenced to this guideline and the statutory maximum term of imprisonment is 20 years or more. *Id.* at ¶ 59. A twelve-level enhancement is applied per USSG §2B1.1(b)(1)(G) based on the known total aggregate loss from the bank fraud schemes, which, as detailed above, is $387,660.35. *Id.* at ¶ 59. A four-level enhancement is applied per USSG §3B1.1(a) to take into account that Defendant was the organizer of the bank fraud schemes and recruited and directed various co-conspirators in connection with these bank frauds. *Id.* at ¶ 59. This enhancement also takes into account the fact Defendant collected and maintained the majority of the profits from the schemes for his own personal use. *Id.* at ¶ 59. An additional enhancement is applied per USSG §3C1.1 to account for Defendant's attempt to obstruct the instant case, which includes his efforts to tamper with his victim's family, among others. *See id.* at ¶¶ 51-53

21

For Counts One, Two, Three, Five, and Six, the base offense level plus these enhancements results in an adjusted offense subtotal of 25. *Id.* at ¶ 76.

### b. Count Four

Count Four charges Committing Physical Violence in Furtherance of an Extortion. This Count is not grouped with other counts as it specifically pertains to the extortion of Mohammed Rabah and Ibrahim Rabah, and therefore represents a distinct harm to these specific victims. *Id.* at ¶ 60.

The applicable guideline for the offense charged in Count Four is USSG §2B3.2, and the base offense level is 18 per USSG §2B3.2(a). *Id.* at ¶ 60. A two-level enhancement is applied per USSG §2B3.2(b)(1) because Defendant expressly threatened the victims with bodily injury. *Id.* at ¶ 60. A one-level enhancement is applied per USSG §2B3.2(b)(2), by reference to USSG §2B3.1(b)(7)(B), because the amount of money demanded from the victims was $25,000. *Id.* at ¶ 60. A two-level enhancement is applied per USSG §2B3.2(b)(4)(A) because Defendant caused a victim bodily injury. *Id.* at ¶ 60. A two-level aggravating role enhancement is applied per USSG §3B1.1(c) because the Defendant was the organizer of this extortion scheme and recruited and directed various co-conspirators in connection with the extortion, as detailed above. *Id.* at ¶ 60. Moreover, as previously explained, a one-level enhancement is applied per USSG §3C1.1 to account for Defendant's attempt to obstruct the instant case. *Id.* at ¶ 60.

For Count Four, the base offense level plus these enhancements results in an adjusted offense subtotal of 29. *Id.* at ¶ 108.

### c. Counts Seven and Eight

Count Seven charges Extortion Conspiracy, specifically with respect to the extortion of Mahmoud Kasem and Hani Kasem. Pursuant to USSG §1B1.2(d), when a count charges a conspiracy to commit more than one offense, it shall be treated as if the defendant were convicted on a separate count of conspiracy for each offense. *Id.* at ¶ 61. Therefore, the calculations in this case must be done separately with respect to the conspiracy to extort Mahmoud Kasem and the conspiracy to extort Hani Kasem. *Id.* at ¶ 61. The conspiracy involving the former is herein referenced as Count 7(a) and the conspiracy involving the latter is herein referenced as Count 7(b).

Count Eight charges Committing Physical Violence in Furtherance of an Extortion, specifically with respect to the extortion of Mahmoud Kasem (Count 7(a)) and Hani Kasem (Count 7(b)). *Id.* at ¶ 61. This Count is grouped with Counts 7(a) and 7(b) per USSG §3D1.2(b), since these Counts involve the same victims, and acts connected by a common criminal objective, namely, the extortion of the Kasems. *Id.* at ¶ 61. The Guidelines do not provide a mechanism by which to divide Count Eight, so for calculation purposes it is grouped with Count 7(a) to address the violence committed towards Mahmoud Kasem. *Id.* at ¶ 61.

The applicable guideline for Counts 7(a) and 8 is USSG §2B3.2, and the base offense level is 18, per USSG §2B3.2(a). A two-level enhancement is warranted per USSG §2B3.2(b)(1) because the victim, Mahmoud Kasem, was expressly threatened with bodily injury. *Id.* at ¶ 61. A one-level enhancement is warranted per USSG §2B3.2(b)(2), by reference to USSG §2B3.1(b)(7)(B), because the amount of money demanded from Mahmoud Kasem was $40,000. *Id.* at ¶ 61. A six-level enhancement is warranted per USSG §2B3.2(b)(3)(A)(ii) because a firearm was otherwise used in relation to Mahmoud Kasem, in that Mahmoud Kasem was pistol-whipped by Defendant's co-conspirators. *Id.* at ¶ 61. A two-level enhancement is warranted per USSG §2B3.2(b)(4)(A) because the pistol-whipping is considered to have resulted in bodily injury. *Id.*

23

at ¶ 61. A four-level aggravating role enhancement is warranted per USSG §3B1.1(a) because Defendant was the organizer of this extortion scheme and recruited and directed various co-conspirators in connection with the extortion, as detailed above. *Id.* at ¶ 61. Finally, and as previously detailed, an additional one-level enhancement is warranted per USSG §3C1.1 because Defendant attempted to obstruct the instant case. *Id.* at ¶ 61.

The applicable guideline for Count 7(b) is USSG §2B3.2, which by way of the cross reference found at USSG §2B3.2(c), directs the use of USSG §2A1.1 if a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111. *Id.* at ¶ 62. Under this provision, the base offense level is 43. Defendant was the organizer of the underlying extortion scheme and recruited and directed various co-conspirators in connection with the extortion, as detailed above. Accordingly, a four-level aggravating role enhancement is warranted per USSG §3B1.1(a). *Id.* at ¶ 62. Finally, and as previously detailed, because Defendant attempted to obstruct the instant case, a two-level enhancement under USSG §3C1.1 is applied. *Id.* at ¶ 62.

For Counts 7(a) and 8, the base offense level plus these enhancements results in an adjusted offense subtotal of 35. *Id.* at ¶ 86. For Count 7(b) the base offense level plus these enhancements results in an adjusted offense subtotal of 49. *Id.* at ¶ 93.

### d. Counts Eleven and Twelve

Counts Eleven and Twelve charge Conspiracy to Make False Statements and Making False Statements. These Counts are grouped pursuant to USSG §3D1.2(b) since they represent a conspiracy and the substantive offense that was the sole object of the conspiracy. *Id.* at ¶ 64.

The applicable guideline for Count Eleven is USSG §2X1.1, and the applicable guideline for Count Twelve is USSG §2B1.1. *Id.* at ¶ 64. Pursuant to USSG §3D1.3(a), the offense level

24

for the most serious of the counts shall be used. *Id.* at ¶ 64. The more serious Count in this instance is Count Twelve. Accordingly, the applicable guideline for these grouped offenses is USSG §2B1.1, and the base offense level is 6, per USSG §2B1.1(a)(2) since the statutory maximum term of imprisonment is less than 20 years. *Id.* at ¶ 64. A two-level enhancement is warranted per USSG §3C1.1 given Defendant's attempt to obstruct the instant case, as described above. *Id.* at ¶ 64. Since no specific offense characteristics apply, and because Defendant's participation in the offenses charged in Counts Eleven and Twelve represent that of the average participant, no role adjustment is warranted as to these charges. *Id.* at ¶ 64.

For Counts Eleven and Twelve, the base offense level plus these enhancements results in an adjusted offense subtotal of 8. *Id.* at ¶ 108.

### e.  Count Thirteen

For Count Thirteen, the guideline sentence is the term of imprisonment required by statute, which is 2 years. *Id.* at ¶ 110. Chapters Three (Adjustments) and Four (Criminal History and Criminal Livelihood) of the Guidelines do not apply to this Count pursuant to USSG §2B1.6(a). *Id.* at ¶ 110.

### 2.  Combined Total Adjusted Offense Level

Where there are multiple count adjustments to consider, units are assigned pursuant to USSG §3D1.4(a), (b) and (c). *Id.* at ¶ 111. One unit is assigned to the group with the highest offense level. One additional unit is assigned for each group that is equally serious or from 1 to 4 levels less serious. *Id.* at ¶ 111. One-half unit is assigned to any group that is 5 to 8 levels less serious than the highest offense level. *Id.* at ¶ 111. Any groups that are 9 or more levels less serious than the group with the highest offense level are disregarded.

25

In the instant case, Counts One, Two, Three, Five and Six constitute Count Group 1. Counts 7(a) and 8 constitute Count Group 2, and Counts Eleven and Twelve constitute Count Group 4. Count 7(b) and Count Four stand alone. Count 7(b) boasts the highest offense level, which is 49. *Id.* at ¶ 111. Therefore, the combined adjusted offense level is 49. *Id.* at ¶ 114. However, pursuant to Chapter 5, Part A (comment n.2), when the total offense level exceeds 43, the offense level will be treated as a level 43. *Id.* at ¶ 117.

Therefore, Defendant has a total combined adjusted offense level of 43. *Id.* at ¶ 117.

### 3. Criminal History Score

In addition to calculating a total combined adjusted offense level of 43, Probation also calculates a criminal history score of 14 and a criminal history category of VI.

In reaching this calculation, Probation considered Defendant's previous convictions discussed above. Specifically, zero points (+0) are added for the conviction stemming from Defendant's March 1, 2000 arrest, *id.* at ¶ 119; (2) two points (+2) are added for the conviction stemming from Defendant's November 22, 2002 arrest, *id.* at ¶ 120; (3) three points (+3) are added for the conviction stemming from Defendant's May 17, 2004 arrest, *id.* at ¶ 121; (4) three points (+3) are added for the conviction stemming from Defendant's May 28, 2004 arrest, *id.* at ¶ 122; (5) two points (+2) are added for the conviction stemming from Defendant's April 25, 2005 arrest, *id.* at ¶ 123; (6) two points (+2) are added for the conviction stemming from Defendant's May 4, 2005 arrest, *id.* at ¶ 124; and (7) two points (+2) are added for the conviction stemming from Defendant's March 20, 2011 arrest, *id.* at ¶ 125.

26

This totals in a criminal history score of 14, which, in turn, produces a criminal history category of VI (6). A total offense level of 43 and a criminal history category of VI (6) result in a recommended Guidelines imprisonment term of life imprisonment. *Id.* at ¶ 156.[1]

### ii. Defense's Guidelines Calculation

#### 1. Total Adjusted Offense Level

The Defense's calculation differs from Probation's. The Defense calculates a total combined adjusted offense level of 33, Def. Memo at 12, and a total criminal history score of 11, resulting in a criminal history category of V (5), *id.* at 13.

The Defense takes issue with several calculations Probation set forth in the PSR. *See id.* at 4-10 (setting forth objections to the PSR on a paragraph-by-paragraph basis). As an initial matter, the Defense challenges the obstruction of justice enhancement applied throughout Probation's calculation. *Id.* at 5 (referencing PSR at ¶¶ 67, 75, 85, 92, 99, and 107). Furthermore, the Defense makes additional objections as follows:

On Probation's calculations regarding Counts One, Two, Three, Five, and Six, *see* PSR at ¶¶ 71-76, the Defense challenges (1) the four-point enhancement applied to account for Defendant's role in the offense, Def. Memo at 4 (referencing PSR at ¶ 74); and (2) the obstruction of justice enhancement, *see* PSR at ¶¶ 51-53 and 67. *Id.* at 5. Instead, Defense calculates an adjusted offense level of 21 for these Counts.

On Probation's calculations regarding Counts Seven and Eight, *see* PSR at ¶¶ 78-93, the Defense challenges (1) the decision to calculate the extortion conspiracy as two separate "groups"

---

[1] Note: none of the offense convictions carry a maximum sentence of life. However, the Court may effectively impose an life sentence by sentencing the Defendant to consecutive terms on multiple counts of convictions.

27

for Guidelines purposes, that is as 7(a) and 7(b); (2) the enhancement taking into account the threat of bodily injury, *see id.* ¶¶ 79 and 82; (3) the "role in the offense" enhancement, *see id.* ¶ 84; and (4) the cross-reference to U.S.S.G. § 2A1.1 with respect to 7(b), *see id.* at ¶¶ 88 and 93. Were these objections sustained, the adjusted offense level for Counts Seven and Eight would be 31 points. *See* Def. Memo at 7-9. However, if the Court were persuaded that the two extortion groups were improperly divided as Counts 7(a) and 7(b), the combined offense level would be 33. *Id.* at 10-11.

On Probation's calculations regarding Counts Eleven and Twelve, the Defense challenges only the enhancement for obstruction of justice, which if sustained, would lead to an adjusted offense level of 6 for these Counts. *Id.* at 9.

On Probation's calculation regarding Count Four, the Defense argues the dual application of the enhancement accounting for the threat of violence and the enhancement accounting for the commission of violence is duplicative. *Id.* at 9. The Defense also reiterates its challenge to the obstruction of justice enhancement and the enhancement accounting for Defendant's "leadership." *See* PSR at ¶ 107. If sustained, these objections would lead to a total adjusted offense level of 23 for this Count. Def. Memo at 10.

Taken together, the Defense's proposed modifications result in a total adjusted offense level of 33. *Id.* at 11.

### iii. The Government's Calculation

The Government agrees with the Guidelines calculations set forth in the PSR. *See* Government's Sentencing Memorandum ("Gov't Memo"), at 17, ECF No. 458. Before addressing the defendants' joint objections and this Defendant's individual objections, the Government's Memo notes as an initial matter that "[t]he Court need not resolve these Guidelines disputes if they

28

would not affect the Court's ultimate sentence." Government Sentencing Memorandum Gov't Memo at 21 (citing See Fed. R. Crim. Proc. 32(i)(3)(B) (stating that the court may decline to resolve any sentencing dispute if it "determine[s] that a ruling is unnecessary…because the matter will not affect sentencing.")).

This Court now expressly and explicitly declines to resolve any sentencing disputes because those disputes have no effect on the sentences in this case.

Now with respect to the joint objections raised by Defendant and co-defendant Bryant, the Government notes the following:

First, the PSR appropriately considers Count Seven separately as to Hani Kasem and Mahmoud Kasem under U.S.S.G. § 1B1.2(d). First, Hani was not merely a bystander, but was the subject of the proven extortion. Therefore, the harm caused to him—his death—can be considered. *Id.* at 22. Counts Seven and Eight specifically alleged, and the jury found, that the Defendant and co-Defendant Bryant agreed to extort both Hani and Mahmoud Kasem. *Id.* at 22 (referencing Verdict Sheet, ECF No. 361 at 3). Therefore, the Government alleges, the record established at trial shows Hani was a victim of the proven extortion scheme. *Id.* at 22

In the alternative, the Government argues even if Hani were somehow a "bystander" and "not the subject" of the proven extortion, the Guidelines would nevertheless account for his murder under USSG. § 2B3.2(c)(1), which directs that the murder Guideline be applied "[i]f a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111." *Id.* at 23. That is because the Second Circuit has made clear that a "victim" for purposes of this cross-reference includes "all persons killed to carry out the extortion scheme," and is not limited to "direct" victims of the extortion. *Id.* at 23 (referencing *United States v. Mulder*, 273 F.3d 91, 117-18 (2d Cir. 2001)). Accordingly, the Government maintains, even assuming Hani Kasem was not a direct

29

victim of the scheme because he was killed during the commission of the extortion, the murder Guideline applies. *Id.* at 23.

Second, the Government argues the PSR properly applies the cross-reference at USSG § 2B3.1(c)(1), which states: "[i]f a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States, apply § 2A1.1 (First Degree Murder)." *Id.* at 23. In so saying, the Government rejects co-Defendant Bryant's claims that the Second Degree Murder Guideline, § 2A1.2, should apply on the grounds the text of the Guidelines is plainly clear that USSG § 2A1.1 shall apply. *Id.* at 23-24.

Third, the Government argues the two-level increase for threat of bodily injury relating to the offense level for the extortion of Mahmoud Kasem is appropriate. *Id.* at 24. The Government maintains the threat of bodily injury is not already incorporated into the base offense level for the offense of conviction. *Id.* at 25 (referencing Guideline § 2B3.2, application note 2 ("[I]f there was any threat, express or implied, that reasonably could be interpreted as one to injure a person or physically damage property, or any comparably serious threat, such as to drive an enterprise out of business.")). The Government also maintains neither the two-level increase for actual bodily injury nor the six-level increase for use a firearm, taken in conjunction with the increase for threat of bodily injury, is impermissibly duplicative; USSG § 2B3.2 accounts for each of these distinct harms with incremental offense level increases. *Id.* at 25.

With respect to this Defendant's individual objections, the Government states the following:

Regarding the objection to the obstruction of justice enhancement, the Government notes: (1) after his arrest, the Defendant allegedly called his brother and discussed tampering with the

30

Kasem family to urge them not to press charges. *Id.* at 30. *See also* PSR ¶ 43. (2) While incarcerated at MDC, Defendant also allegedly offered to pay Co-Defendant McCoy tens of thousands of dollars to falsely exculpate Defendant. Gov't Memo at 20. *See also* PSR at ¶ 44. (3) Lastly, the Government references Count Fourteen of the Indictment on which Defendant was charged with–but ultimately acquitted of–Obstruction of Justice. *See* Gov't Memo at 31. On this last point, the Government notes this Court may consider this charge and the conduct discussed in points (1) through (3) at sentencing provided they are demonstrated by a preponderance of the evidence. *Id.* at 31. *See, e.g., United States v. Vaughn*, 430 F.3d 518, 527 (2d Cir. 2005) ("[D]istrict courts may find facts relevant to sentencing by a preponderance of the evidence, even where the jury acquitted the defendant of that conduct.").

Regarding the objection to the role adjustments, the Government argues the Guidelines clearly permit the sentencing court to consider the defendant's role in the offense with reference to the entire group, not with reference to each individual count of conviction within a group. Gov't Memo at 31 (referencing USSG § 3B1.1). Moreover, the Government contends the role enhancements for the extortions of Mahmoud and Hani Kasem are similarly warranted based on the record produced at Defendant's trial. *Id.* at 32.

### 1.  Criminal History Score

In addition to objecting to Probation's offense-level calculations, the Defense also takes issue with the criminal history score and category calculations set forth in the PSR. *See* Def. Memo at 11-13. Specifically, the Defense argues Defendant's arrest on November 22, 2002 should account for (+1) and not (+2), *see* PSR at ¶ 120; and Defendant's arrests on April 25, 2005 and

31

May 4, 2005, should be merged and account for a combination of (+2) and not (+4). Def. Memo at 11-12.

The Defense maintains Defendant's criminal history score is 11, not 14, and thus the criminal history category for the instant offense is V (5) rather than VI (6). *Id.* at 13.

They then calculate a total adjusted offense level of 33 and a criminal history category of V (5) results in a Guidelines range of 210 to 262 months. *Id.* at 13.

## iv.   Recommendations

### 1.   Probation

Based on the findings set forth in the PSR, the United States Probation Department recommends the following: (1) on Counts One, Two, Three, Five, and Six, 10 years of incarceration on each count to run concurrently with each other and consecutively to all other counts; (2) on Count Four, 10 years of incarceration to run consecutive to all counts; (3) on Counts Seven and Eight, 20 years of incarceration on each count to run concurrently with each other and consecutively to all other counts; (4) on Counts Eleven and Twelve, 5 years of incarceration on each count—the statutory maximum—to run concurrently with each other and consecutively to all other counts; (5) on Count Thirteen, 2 years of incarceration—the statutory requirement—to run consecutive to all other counts. *See* U.S. Probation Department Sentence Recommendation ("Probation's Recommendation") at 1, ECF No. 442-1.

Probation also recommends the following regarding supervised release: (1) on Counts One through Eight and Counts Eleven and Twelve, 3 years of supervised release to run concurrently with each other and with Count Thirteen; (2) and on Count Thirteen, 1 year of supervised release to run concurrent with Counts One through Eight and Counts Eleven and Twelve. *Id.* at 1.

32

Probation also recommends special conditions to accompany any term of supervised release. *Id.* at 1.

In issuing its recommendation, Probation recognizes it is proposing a life sentence. *Id.* at 3. Still, Probation did not find any factors that would warrant a departure from the recommended guidelines range, PSR at ¶ 172, nor did Probation identify any factors that would warrant a sentence outside the advisory Guidelines system. *Id.* at ¶ 173.

### 2. Government

The Government believes an effective life sentence is warranted here given (1) the nature and circumstances of Defendant's offense, (2) the personal history of this Defendant, (3) the need for deterrence, both general and specific, (4) the need to protect the public, and (5) the Court's interest in promoting respect for the law.

First, the Government cites the serious nature of the instant offense, which cannot, in their view, be overstated. Gov't Memo at 33. Specifically with respect to the murder of Hani Kasem, the Government urges the Court to consider the unfathomable impact Defendant's actions have had on the Kasem family, whose members have spoken at length about this unimaginable tragedy, the impact it has had, and the likelihood that they will be in mourning for the rest of their lives. Victim Impact Statement, ECF No. 462.

This Court heeds the Government's request; it has reviewed the numerous letters written by members of the Kasem family, and it understands that they continue to suffer for their loss. *Id.* *See also* Gov't Memo at 34 (referencing the Victim Impact Statement).

This Court hears the voices of Mr. Kasem's loved ones; it knows of the heartache, loss, and struggle felt by this family. *See* Victim Impact Statement. The Court knows the lives of those

33

in the Kasem family will never be the same because of the actions of this Defendant. The Court knows their rock was stolen from them by this senseless murder, and that their joy and happiness were taken along with it. *Id.* This Court cannot and does not overlook this.

To be sure, the Government also urges the Court not to overlook the impact Defendant's various frauds and extortion schemes and acts of violence have had on all of Defendant's many victims. *Id.* at 35. This Court does not.

In addition, the Government asks the Court to consider the Defendant's extensive and violent criminal history. It does. *Id.* at 35-37. It considers the fact Defendant has been convicted of larceny, assault, fraud, and criminal mischief, all prior to the instant offense. *Id.* at 35-37. It also notes Defendant has also incurred at least 11 infractions during his present period of incarceration. *Id.* at 37. *See also* PSR at ¶ 138 (detailing these infractions).

Moreover, the Government also suggests that Defendant's myriad crimes are not attributable to a troubled childhood or any other intervening cause. Govt' Memo at 37. To the contrary, Defendant himself remarked on his fortunate circumstances growing up in a supportive home with a loving family. PSR at ¶¶ 132-146. This, the Government finds, reveals Defendant's true character as a man prone to violence and motivated merely by greed. *See* Gov't Memo at 38.

As to the Court's interest in specific deterrence, the Government notes Defendant's various arrests, convictions, and subsequent terms of incarceration have done little to sway him from committing further unlawful conduct. *Id.* at 39. Therefore, the Government argues, there is no reason to think, if the Defendant were released, he would begin leading an upright life. *Id.* at 39.

Lastly, the Government urges the Court to consider the gravity of the instant offense, and the need to sway those who may consider committing similar offenses from engaging in this horrific course of conduct. *Id.* at 40. In the very least, the Government asks this Court to promote

34

respect for the law, which Defendant has repeatedly failed to do. *Id.* at 40. This Court considers all.

### 3. Defense

On the other hand, the Defense urges the Court to depart from the recommended guidelines range and to impose a non-guidelines sentence far less than 20 years. *See* Def. Memo at 13, 16. The Defense raises several arguments in support of this position that this Court addressed *supra* in Section III(b).

This Court appreciates the sentencing arguments raised by the parties, and it has carefully considered each of these arguments.

### e. Pertinent Policy Statement(s) of the Sentencing Commission

The fifth § 3553(a) factor requires the Court to evaluate "any pertinent policy statement…issued by the Sentencing Commission." 18 U.S.C. § 3553(a)(5).

In its analysis of this factor, rather than cite policy statements issued by the Sentencing Commission—as this statute instructs the Court to do—the Defense cites caselaw, including the Supreme Court's ruling in *United States v. Booker* and its progeny, reiterating the advisory nature of the Sentencing Guidelines and the broad discretion of sentencing courts to depart from the Guidelines where appropriate. *See* Def. Memo at 21.

Finding no other references to pertinent policy statements raised in the parties' submissions, this Court's analysis proceeds to the penultimate factor listed in Section 3553(a): the need to avoid unwarranted sentence disparities.

f.  The Need to Avoid Unwarranted Sentence Disparities

The sixth § 3553(a) factor requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

The Defense maintains a non-Guidelines sentence would not only fail to create a sentence disparity, but is also necessary to avoid an overly punitive sentence. Def. Memo at 28.

For the reasons stated in this Memorandum and Order, and considering the other six § 3553(a) factors, the Court's sentence avoids unwarranted sentence disparities

g.  The Need to Provide Restitution

Lastly, the seventh § 3553(a) factor requires the Court to touch upon "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7).

As discussed *supra* at Section III(C), restitution in this instance is mandatory pursuant to 18 U.S.C. § 3663A. However, the Court reserves its right pursuant to 18 U.S.C. § 3664(d)(5) to determine the amount owed as the Court still awaits responses from Defendant's victims and his victims' families. PSR at ¶ 169.

## IV.  Conclusion

Finally, the Court has this to say to the families of the victims of these crimes: Ladies and Gentlemen, this Court humbly acknowledges and respects your heartfelt loss. This Court humbly thanks you for the honor of introducing me to the great man, Mr. Hani Kasem, who truly was and truly remains. In the days, the weeks, the months, and the years ahead, you will continue to recall, to share, to reflect, and to enhance our lives with your loving tributes to his.

36

As long as you speak his name, he will live, live not only among you, but among all of us—among all of us in the Eastern District of New York; among all Americans in this our one nation, under God, with Liberty and Justice for all. Our United States of America. God bless and keep you and your families safe, now and forever.

This Court hereby sentences the Defendant Ppassim Elder to a sentence of life incarceration, restitution in an amount to be determined, forfeiture in the amount of $330, 561.36, and a $1,100 mandatory special assessment is appropriate and comports with the dictates of § 3553. This sentence is consistent with, and is sufficient but not greater than necessary to accomplish, the purposes of § 3553(a)(2).

The Court expressly adopts the factual findings of the Presentence Investigation Report and the addenda thereto, barring any errors contained therein, to the extent they are not inconsistent with this opinion.

**SO ORDERED.**

s/ WFK

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: February 9, 2023
Brooklyn, New York

37